Commonwealth of Pennsylvania, Plaintiff *v.* Barnes & Tucker Company, Defendant.

Argued September 10, 1975, before President Judge BOWMAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER, ROGERS and BLATT.

*K. W. James Rochow,* Assistant Attorney General, with him *Michael S. Alushin,* Assistant Attorney General, for plaintiff.

*Cloyd R. Mellott,* with him *C. Arthur Wilson, John R. Kenrick, Eckert, Seamans, Cherin & Mellott, Frank A. Sinon,* and *Rhoads, Sinon & Reader,* for defendant.

OPINION BY PRESIDENT JUDGE BOWMAN, March 2, 1976:

In reversing this Court and remanding the case to us for further proceedings consistent with its opinion, *Commonweath v. Barnes & Tucker Company,* 455 Pa. 392, 319 A.2d 871 (1974), the Supreme Court in our analysis of its opinion, has unequivocally declared:

(1) that the discharge of acid mine drainage from Mine No. 15 into the waters of the Commonwealth constitutes a public nuisance at common law as well as under the applicable statutory law, and that relief could be granted under either of these theories.

(2) that the absence of facts supporting concepts of negligence, foreseeability or unlawful conduct is not fatal to a finding that a common law nuisance exists.

(3) that the doctrine of laches, waiver or estoppel as against the Commonwealth are not available to Barnes & Tucker; nor can those who pollute streams acquire prescriptive or property rights to so pollute as against the Commonwealth.

Having so declared, the Supreme Court then addressed itself to the issue of whether relief should be granted in these words: "[h]aving determined that there is a basis upon which the Commonwealth *could* be granted relief, we must now determine whether relief *should* be granted." *Barnes & Tucker, supra,* 455 Pa. at 414, 319 A.2d at 883. (Emphasis in original.) However, the Supreme Court did not resolve this issue but instead, remanded the proceedings to this Court.

It is this language and that found in subsequent portions of its opinion that has produced total disagreement as between the parties of the issues on remand.

In addressing itself to the broad issue of whether relief *should* be granted against Barnes & Tucker in abatement of the instant public nuisance, the Supreme Court totally rejected, in our view, a number of constitutional arguments advanced by Barnes & Tucker. As to these arguments, it said:

"The imposition of liability in this case also requires our consideration of constitutional objections based on the Fourteenth Amendment to the United States Constitution and article I, Section 10, of the Pennsylvania Constitution. We do not believe that a finding of liability for and responsibility to abate the discharge from Mine No. 15 would deny Barnes & Tucker due process of law,[13] or equal protection of

---

"[13] Several questions which were previously discussed in another context might also be raised here under a due process argument. They include the facts that the Commonwealth had not in the past moved to enjoin the discharge of mine drainage during the operation

the law,[14] in violation of either the United States or Pennsylvania constitutions." 455 Pa. at 416-17, 319 A.2d at 884.

In response to other constitutional arguments advanced by Barnes & Tucker, the Supreme Court identifies the issues on remand as we understand its opinion. These issues are more circumscribed than as posed by Barnes & Tucker but not so simplistic as posed by the Commonwealth, which insists that our sole responsibility is to determine whether alternate means of abatement are

of Mine No. 15 and that the operation of Mine No. 15 was in accordance with The Clean Streams Law. These contentions do not raise additional due process problems. Not only can one not obtain a prescriptive right to maintain a public nuisance, but where the state police power is found to exist, it is not lost by non-exercise, but remains to be exerted as local exigencies may demand. Kelly v. Washington, 302 U.S. 1, 14 (1937). As to the second contention, the United States Supreme Court noted in Queenside Hills Co. v. Saxl, 328 U.S. 80, 83 (1946), that: 'In no case does the owner of property acquire immunity against exercise of the police power because he constructed it in full compliance with the existing laws.'

"[14] We summarily dismiss Barnes & Tucker's claim that the prosecution of this action constitutes a denial of the equal protection of the laws. There has been no showing that the Commonwealth's action was an intentional discrimination in the enforcement of the law. Indeed, since to a large extent this as a case of first impression, and recognizing the substantial costs of litigation here involved, it is only reasonable that the Commonwealth await the ulti-

available if Barnes & Tucker offered additional evidence on this subject, which it did not.

The critical portions of the Supreme Court's opinion from which we identify our responsibility on remand as circumscribed by its pronouncements heretofore referred to, are found in the following exerpts:

"Whether it is a 'taking of property' to require Barnes & Tucker to treat or abate the discharge from Mine No. 15 is a more difficult question. The power of the Attorney General to abate public nuisances is an adjunct of the inherent police power of the Commonwealth. There is often a thin line separating that which constitutes a valid exercise of the police power and that which constitutes a taking. The United States Supreme Court has abnegated any generally applicable standards in this area, but the classic rule of Lawton v. Steele, 152 U.S. 133 (1894), is instructive.

" 'To justify the State in . . . interposing its authority in behalf of the public, it must appear, first, that the interests of the public . . . require such interference; and second, that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals.' Id. at 137.

"From our prior discussion it is clear that the public interest requires the interposition of the Commonwealth's authority in this case. Furthermore, since the activity involved is a public nuisance it cannot be regulated, but must be abated. We believe that abatement of water pollution is unquestionably a reasonable exercise of the police power in the abstract. We are not swayed in this belief by the fact that the mining activity which gave rise to the present condition is past conduct which obviously cannot now be abated. . . .

---

mate outcome of this case before bringing similar actions."

"We recognize that when the Commonwealth brings an equity action to abate a public nuisance its right to relief is not restricted by any balancing of equities, nor by any rule of damnum absque injuria. [Citations omitted.] The exercise of the police power is nevertheless restricted by the parameters of reason. Whether the Comonwealth's use of such power in this case would be unduly oppressive upon Barnes & Tucker would naturally depend on the relief granted. The prayer for relief was for the abatement or treatment of the discharge from Mine No. 15. On the present record it would be impossible for this Court to fashion an appropriate decree. The precise nature of relief which would be warranted and reasonable in this case must rest with the chancellor who may need to take additional testimony and make additional findings of fact in so determining.[16]" 455 Pa. at 418-20, 319 A.2d at 885-86.

---

"[16] The possibility of sealing and isolating Mine No. 15 so as to prevent future discharges may exist, but the feasibility of such relief was not directly addressed below. Much of the testimony below was concerning the mines adjacent to Mine No. 15, the barriers and cut throughs between them, the quantity and quality of water generated in each of the mines, the amount of fugitive water migrating into Mine No. 15, and whether, but for the fugitive waters, any discharge would occur at Mine No. 15. We believe a finding in regard to the sources of water being discharged from Mine No. 15 would be relevant in a determination of the appropriate relief. In this regard we note a key distinction from the situations present in Commonwealth v. Harman Coal Co. and Commonwealth v. Pittsburgh Coal Co., 452 Pa. 77, 306 A.2d 308 (1973). Those cases involved the

Addressing ourselves first to the possibility of sealing and isolating Mine No. 15, the record of the case discloses no definitive testimony or other evidence on this subject, nor did either party on remand choose to offer additional evidence on this subject. While the volume and source of mine water "generated" in Mine No. 15 and flowing into it from adjoining and nearby subsurface mines by reason of pressure or gravity are highly disputed as between the parties' experts, there is no dispute that the volume of mine water flowing into and accumulating in it precludes any effort to perfectly seal it from adjoining mines, to seal it against a breakout, or to foreseeably estimate a diminution of volume enabling the mine itself to reservoir the mine water.

On the record before us, if the discharge of acid mine drainage from Mine No. 15 "must be abated" there is no alternative method of relief available to that of the treatment of the discharging mine water. The one known and demonstrated methed treatment as disclosed by the record is by the method and means employed at the Duman Dam facility. Other means and methods may exist or develop in future technology. However, if Barnes & Tucker is to be required to abate this public nuisance, the chancellor, in fashioning the abatement relief, has before him no alternatives and must order abatement by this means and method, subject, of course, to future modification of the abatement order upon proper proof and showing of feasibility of an alternative course of action.

---

*pumping* of water from abandoned mines in connection with the *operation* of working mines. In the present case we are essentially dealing with a natural discharge (but for the pumping at Duman Dam) from an *abandoned* mine which may include acid mine drainage which originated in adjacent abandoned mines." (Emphasis in original.)

Leading to the difficult issue of whether the only abatement relief that can be fashioned by this Court would equate an unconstitutional taking of property of Barnes & Tucker or be beyond the "parameters of reason," the Supreme Court strongly suggests the relevancy of the quality and quantity of mine water generated in Mine No. 15 and mine water finding its way into Mine No. 15 from adjoining or nearby subsurface mines.

In our original opinion, *Commonwealth v. Barnes & Tucker Company*, 9 Pa. Commonwealth Ct. 1, 303 A.2d 544 (1973), we made extensive findings of fact in both narrative form and by enumerated findings which we deemed essential to the opinion as rendered. We did not, however, make such findings particularly directed to this subject. Having again reviewed the record, we restate for background purposes and make findings of fact on this subject.[1]

Before doing so, we shall briefly discuss the evidence on this subject and our reasons in support of these findings. The "generation" of water in subsurface mines appears to be a word of art employed by mining hydrologists and others knowledgable in the field to identify by volume the amount of water flowing or percolating into a mine by gravity from the land surface. "Fugitive mine water" is a phrase used to identify mine water entering a particular mine by gravity or pressure from adjoining subsurface mines. Thus, the volume of mine water entering or contained in a particular mine is the combined volume of generated and fugitive mine water.

The methodology by which such mine waters are measured, both as to source and volume, is disputed by the parties' experts, all of whom premised their opinions on necessary assumptions for want of actual knowledge of the conditions of pillars in and barriers between all of the several mines of the complex known as the Barnes-

---

1. As this bitterly contested case is undoubtedly destined for another review by our Supreme Court, these findings will enable the Supreme Court to finally dispose of this dispute on the merits.

boro Basin, and the absence of scientific criteria to support fundamental assumptions.

The subsurface geology of the basin with marked synclines and anticlines containing several seams of coal and encompassing a number of mining complexes posed extremely difficult, if not insurmountable, obstacles to the witnesses in expressing their expert opinions, and equally, if not greater, difficulty to us in evaluating such evidence. Within this mining complex and stated by the witnesses for Barnes & Tucker as contributory fugitive mine water into Mine No. 15 are the Moss Creek Mine, Colver Mine, the Sterling complex of mines and Lancashire Mine No. 14 (owned and operated by Barnes & Tucker).

On balance, we believe the testimony of the expert witnesses for Barnes & Tucker, as supported and illustrated by sundry exhibits, carries more weight. Their ultimate opinions as to generation of water in Mine No. 15 and the source and volume of fugitive mine water entering Mine No. 15 in areas in which there is conflicting testimony is, therefore, accepted.

## RESTATED AND ADDITIONAL FINDINGS OF FACT

1. Mine No. 15, a bituminous deep coal mine, is located in the "B" or Lower Kittanning seam of coal in an area of Cambria County and Indiana County, Pennsylvania, known as the Barnesboro Basin. The Barnesboro Basin is an area bounded on the east by the Laurel Hill Anticline, on the west by the Nolo Anticline, on the south by unmined coal, and on the north by the West Branch of the Susquehanna River. The Laurel Hill Anticline and the Nolo Anticline represent the highest points of the Basin in terms of elevation. The lowest portion of the Basin which lies between those two anticlines is known as the Barnesboro Syncline. At the southerly end of the Basin, the Barnesboro Syncline is in unmined coal. From that point, it progresses eastwardly to a mined area in a mine known as the Colver Mine and then northwardly

into Mine No. 15. It then progresses through the length of Mine No. 15 into a mine known as Springfield No. 4 and then out the northern end of the Basin. Most of the area of Mine No. 15 is located in the Barnesboro Syncline and is located in the lowest portion of the Barnesboro Basin. It contains approximately 6,600 acres.

2. The driftmouth of Mine No. 15 is located near Barkerton on the West Branch of the Susquehanna River at an elevation of approximately 1,531 feet. A drift opening in a mine is an opening which is made at a point where the coal seam in which the mine is located outcrops at or near the surface of the ground.

From the point where the driftmouth of Mine No. 15 is located at the outcrop of the "B" seam of coal near the West Branch of the Susquehanna River, the "B" seam of coal slopes downward in a southwesterly direction.

3. The earliest mining in Mine No. 15 was in the year 1915 and was done in the northeasterly section of the mine at or near where the "B" seam of coal outcrops near the West Branch of the Susquehanna River. From that point, the mining in Mine No. 15 was done to the dip, that is, from the highest point of elevation in the mine at the outcrop down the slope of the "B" seam in a southwesterly direction to the lowest area of the mine which is at an elevation of approximately 1,230 feet.

4. There are known cut throughs between the Sterling mine complex and Lancashire Mine No. 14, and between Lancashire Mine No. 14 to Mine No. 15.

5. There are breached barriers between the Colver Mine and the Sterling mine complex and between the Colver Mine and Mine No. 15 which would permit the flow of water through those barriers from Colver.

6. There are breached barriers between the Sterling mine complex and Mine No. 15 and Lancashire No. 14 which would permit the flow of water through those barriers from the Sterling mine complex.

7. The Colver Mine, the Sterling mine complex, the Moss Creek Mine and Lancashire Mine No. 14 are all

under less cover than Mine No. 15 and would, therefore, generate more water than Mine No. 15.

8. Caving has occurred in a portion of Mine No. 15 under the Moss Creek Mine complex where pillaring was done. As a result, the strata between the two mines is broken in this area which permits the flow of water from the Moss Creek Mine complex into Mine No. 15.

9. Although mine water generated in other mines in this complex of mines and flowing into Mine No. 15 as fugitive mine water may have varying relative akaline properties as generated in such mines, its acid content increases as it passes along the strata, pillars and through breached barriers containing high acid properties.

10. There has been pillaring on both sides of the barriers between Mine No. 15 and the Colver Mine, between Mine No. 15 and the Sterling mine complex, and between the Colver Mine and the Sterling mine complex.

11. The pillaring referred to in paragraph 10 would result in a fracturing at a minimum angle of draw of 15° from both sides of the barrier. This would result in a complete fracturing of the barrier at the top of the cone and allow water to flow into Mine No. 15.

12. At one point along the barrier between the Colver Mine and Mine No. 15, the top of the cone, using the 15° angle of draw, would be 25 to 50 feet below the water level in the Colver Mine; and, using the 18° angle of draw, would be 85 feet to 130 feet below the water level in the Colver Mine. The higher the angle of draw the greater amount of water which would flow over the top of the cone from Colver Mine into Mine No. 15.

13. The water level in the Colver Mine is at an elevation of approximately 1,680 feet, while the coal elevation in Mine No. 15 at the location opposite the barrier between Mine No. 15 and the Colver Mine is approximately 1,235 feet; and the water level in Mine No. 15 at the time of the trial was approximately 1,480 feet. This would result in a head (height difference) of water of approximately 425 feet to 450 feet against the barrier in the

Colver Mine adjacent to Mine No. 15, and a net water head differential between the two mines of 178 feet to 200 feet.

14. There is a substantial pool of water of approximately 3 billion gallons in the Colver Mine against the barriers of that mine with the Sterling mine complex and Mine No. 15.

15. The total acreage in Mine No. 15 is 6,600 acres, while the total acreage of the Colver Mine within the drainage basin is 8,320 acres.

16. The total water being discharged from the Colver Mine on May 23, 1966, was 9.48 million gallons per day. At the time of trial, the total water being discharged from the Colver Mine, by virtue of a gravity discharge, was 3.35 million gallons per day, over 6 million gallons per day less than the earlier date, at a time when less mining and pillaring had been done in the mine. Mining, including pillaring, has continued on a regular basis in the Colver Mine since May 1966.

17. At the time that it was decided to let the water in the Colver Mine accumulate in the lower portion of that mine next to Mine No. 15 and the Sterling mine complex, it was the expectation of its owner that there would be a flow of water into the Sterling mine complex.

18. There is a considerable amount of sandstone in the area of Mine No. 15, the Colver Mine, and the Sterling mine complex which would act like a pipeline for the transference of mine water. Voids created by disintegrating pillars and breaches between barriers also permit transference of substantial quantities of mine water.

19. There has been actual observation of quantities of water flowing into Mine No. 15 through a barrier between it and the Sterling Mine.

20. The primary purpose of barriers between coal mines in bituminous coal fields is to protect the miners in active coal mines by preventing the sudden influx or inrush of water into the active workings which would en-

danger the lives of the men in those workings. The purpose is not to prevent the flow of water from one mine to another.

21. To maintain a static level of water in Mine No. 15 thereby avoiding a breakout by pressure or other discharge, it is necessary to pump from the mine approximately 7.2 million gallons per day.

22. Of this pumping figure, approximately 1.2 million gallons per day are attributable to water generated in Mine No. 15 while approximately 6 million gallons per day are attributable to fugitive mine water generated in other mines in the complex and finding its way into Mine No. 15.

23. The evidence is inconclusive as to whether Mine No. 15, if totally isolated from fugitive mine water or if receiving only a modest volume of fugitive mine water, would or would not produce a breakout or other surface discharge at some time in the future by reason of the mine water generated in Mine No. 15. To guard against such a possibility, the volume of mine water to be pumped and treated would, however, be of a substantially lesser quantity.

24. The monthly cost of pumping and treating acid mine water being pumped from Mine No. 15 to maintain a relative static level of water in said mine as directed by preliminary injunction and permanent injunction varies between $30,000 and $50,000.

25. There is no evidence of record by way of estimate or otherwise as to a foreseeable time at which Mine No. 15 will maintain itself at a static level without the necessity of pumping and treatment of the pumped acid mine water discharge. There is evidence that the degree of acidity of the discharge may slowly be reduced as the mine "cleans" itself.

26. The evidence is inconclusive as to the comparative quality of mine water generated in Mine No. 15 as against that of fugitive mine waters finding its way into said mine from other mines.

Given these facts, we now consider whether the only possible effective abatement order that can be entered on the record before us would (a) constitute an exercise of the police power equivalent or amounting to a taking of property without just compensation, or (b) as being beyond the "parameters of reason" in an otherwise valid exercise of the police power.

As a threshold argument on these two related and perhaps inseparable issues, Barnes & Tucker contends that a fundamental prerequisite to the imposition of the *relief* required in this case is a showing that defendant's conduct proximately caused the creation of the public nuisance here found to exist.

While we agree with the principle that an owner of land cannot lawfully be required to abate a public nuisance existing on his land where such ownership is unrelated to the forces or conditions resulting in a public nuisance, *Commonwealth v. Wyeth Laboratories,* 12 Pa. Commonwealth Ct. 227, 315 A.2d 648 (1974), we do not view Barnes & Tucker's ownership and use of Mine No. 15 as qualifying it for application of this principle. In this case, our Supreme Court has already declared that "[t]he absence of facts supporting concepts of negligence, foreseeability or unlawful conduct is not in the least fatal to a finding of the existence of a common law public nuisance." *Barnes & Tucker, supra,* 455 Pa. at 414, 319 A.2d at 883. We undersand this to mean that traditional criteria to establishment of tortious or unlawful conduct in the law of negligence has no application in public nuisance cases for the reason that such an assumption is "based upon an entirely mistaken emphasis upon what the defendant has done rather than the result which has followed, and forgets completely the well established fact that negligence is merely one type of conduct which may give rise to a nuisance." W. Prosser, Law of Torts, §88, at 595 (3d ed. 1964).

Here the activity or conduct of Barnes & Tucker and its predecessors, through mining operations, created the

subsurface void at the subsurface elevations within Mine No. 15 in the Barnesboro Basin complex of mines. Out of this activity was created a condition which has in turn resulted in a public nuisance. Whether the impelling force which produced the public nuisance is solely or partially that of fugitive mine water flowing into and adding to the generated water of that mine, the conduct of Barnes & Tucker in its mining activity remains the dominant and relevant fact without which the public nuisance would not have resulted where and under the circumstances it did. In our opinion, Barnes & Tucker does not qualify as exempt from the imposition of relief in abatement of a public nuisance for want of conduct or activity by it bearing upon the forces and conditions producing the public nuisance. Whatever vitality our decision in *Pittsburgh Coal Company v. Sanitary Water Board,* 4 Pa. Commonwealth Co. 407, 286 A.2d 459 (1972), may retain, having been reversed by the Supreme Court,[2] and considered in light of the Supreme Court decision in this case, its pronouncements cannot support Barnes & Tucker's contention here that want of proof of proximate cause in traditional negligence concepts has constitutional proportions to be applied to the relief to be ordered in abatement of a public nuisance.

The "difficult question" of whether the only possible effective abatement order that can be entered in this case constitutes, in itself, such a taking, or as being beyond the parameters of reason, finds no ready answer in our case law precedents.

Couched in terms of economic impact, our courts have consistently held an otherwise valid exercise of the police power does not effectuate a constitutional taking of property for public use even though (a) its exercise resulted in the entire suppression of the business, *Commonwealth v. Emmers,* 221 Pa. 298, 70 A. 762 (1908) ; (b) or at whatever the cost to the party introducing the danger

---

2. 452 Pa. 77, 306 A.2d 308 (1973).

being proscribed, *Erie Railroad Company v. Board of Public Utility Commissioners*, 254 U.S. 394 (1921) ; and (c) even when it forces the offending industry out of business, *Bortz Coal Company v. Commonwealth*, 2 Pa. Commonwealth Ct. 441, 279 A.2d 388 (1971).

However, the application of these pronouncements in public nuisance cases has not always been absolute (a) where such drastic results are "patently beyond the necessities of the case," *Commonwealth ex rel. Allegheny County v. Toth*, 189 Pa. Superior Ct. 552, 152 A.2d 284 (1959), or (b) where further proceedings are indicated to inquire whether the resulting damage could be avoided and whether the expense to abate would be practically prohibitive, *Commonwealth v. Wyeth Laboratories, supra;* or, as suggested by the Supreme Court in this case, (c) as being beyond the parameters of reason.

From these decisions and many others expressing similar principles, we are of the opinion that a proper exercise of the police power by legislative enactment[3] does not, in itself, constitute a taking of property for public use, or its equivalent, regardless of the economic impact upon the property of the persons affected thereby. However, as to governmental action in enforcement of such legislation which does not itself absolutely proscribe a particular use, conduct or activity, the means of enforcement must be carefully scrutinized to determine its necessity in accomplishment of the objections of the legislation and its reasonableness as measured by alternative available remedies and by the relative conflicting public interest as against the private interest. This, of course, produces a case by case approach to this difficult question.

In this case, however, we have no way of measuring such economic impact. Although afforded an opportunity on remand to introduce such additional evidence as it

---

3. *Cf. Gambone v. Commonwealth*, 375 Pa. 547, 101 A.2d 634 (1954), as illustrative of an attempted exercise of the police power held to be improper in itself.

deemed relevant to the issues on remand, Barnes & Tucker did not see fit to introduce any new evidence into the case. We are thus without knowledge of its capital structure, assets and liabilities or its profits or losses, if any.

We know only the monthly costs, now accumulated over several years, of operating the Duman Dam facility to pump and treat the mine water accumulating in Mine No. 15, which has been closed and remains closed to this date. On such a record Barnes & Tucker would have us declare that the costs of operating the Duman Dam facility at its expense as the only presently known method of abating the nuisance in question is the equivalent of a taking of its property or as beyond the parameters of reason, thereby effectively isolating this cost from the relative economic impact thereof upon its corporate assets and profits. No precedent is cited for such a convenient insulation of corporate assets from its responsibility and attendant costs of abating this public nuisance, and we will not establish one here by concluding that the cost of treating the mine drainage is per se beyond the parameters of reason or the equivalent of a taking of its property. As measured against the deleterious impact of the untreated mine water entering the waters of the Commonwealth upon the health, safety and welfare of the citizens of the Commonwealth, not to mention the less obvious impact upon the environment in general, Barnes & Tucker falls far short of the burden required of it to preclude entry of an abatement order on constitutional grounds.

We conclude on the record before us:

1. That the only known effective abatement order which can be entered in this case is to direct the pumping and treatment of the acid mine water accumulating in Mine No. 15, and to produce through such treatment, discharged water meeting minimum water quality standards as prescribed by regulation.

2. That the discharge by breakout at the surface or otherwise, of accumulated acid mine water from Mine No. 15 into the waters of the Commonwealth, being a public nuisance, is, for purposes of the abatement thereof, the responsibility of Barnes & Tucker and that it has such responsibility regardless of the quality or quantity of fugitive mine water finding its way into Mine No. 15 from adjoining or nearby subsurface mines.

3. That the only known effective abatement order which can be entered in this case does not constitute a taking of the property of Barnes & Tucker, or its equivalent, contrary to its constitutional right to just compensation for property so taken.

4. That the only known effective abatement order which can be entered in this case is not beyond the parameters of reason nor other test in determination of the need for reasonableness of an abatement order.

Accordingly, on remand from the Supreme Court of Pennsylvania, we enter the following

FINAL DECREE

Now, March 2, 1976, it is hereby decreed and ordered as follows:

1. Barnes & Tucker Company is hereby enjoined from causing or permitting the discharge of untreated acid mine water drainage, by breakout or otherwise, from Mine No. 15 into the waters of the Commonwealth.

2. For the purpose of avoiding repetition of such a breakout or the discharge of untreated acid mine water from Mine No. 15 into the waters of the Commonwealth, a public nuisance; and until such time as the likelihood of a reoccurrence of another breakout is past, Barnes & Tucker Company shall cause to be pumped from Mine No. 15 sufficient quantities of mine water to avoid any such breakout and shall maintain a treatment program of the mine water discharge to achieve minimum water quality standards as prescribed by law pertaining to the

discharge of acid mine water into the waters of the Commonwealth.

3. Expenses incurred by the Commonwealth in the operation and maintenance of the Duman Dam pumping and treatment facility or sums paid by the Commonwealth to Barnes & Tucker incident to the operation of said pumping and treatment facility by Barnes & Tucker during the course of this litigation as prescribed in our prior Orders of April 13, 1971, June 7, 1973 and September 20, 1974, shall be entered as a money judgment in favor of the Commonwealth and against Barnes & Tucker Company. If the parties can agree and so stipulate as to the sum certain thereof, a judgment in said amount will be entered as a supplement to this Decree and Order. If the parties cannot agree as to the sum certain thereof, after hearing on the issue, a judgment in a sum certain will be entered as a supplement to this Decree and Order.