598

William A. Lucas and August J. Lucas, Petitioners *v.* Commonwealth of Pennsylvania, Department of Environmental Resources, Respondent.

Commonwealth of Pennsylvania, Department of Environmental Resources, Petitioner *v.* William A. Lucas and August J. Lucas, Respondents.

Argued June 3, 1980, before President Judge CRUMLISH and Judges MENCER, ROGERS, BLATT, CRAIG, MACPHAIL and WILLIAMS, JR. Judge WILKINSON, JR. did not participate.

*Albert E. Vogel, Jr.,* Assistant Attorney General, with him *Thomas Y. Au,* Assistant Attorney General, for Commonwealth of Pennsylvania.

*Leo M. Stepanian, Brydon & Stepanian,* for William A. Lucas and August J. Lucas.

OPINION BY JUDGE MACPHAIL, September 3, 1980:

William A. Lucas and August J. Lucas (Appellants) appeal and the Department of Environmental Resources (DER) cross-appeals from an adjudication and order of the Environmental Hearing Board (EHB), which sustains in part and dismisses in part an order issued by DER. By prior order of court the cases were joined for disposition. We affirm the adjudication and order of the EHB.

The pertinent facts of this case are the following: Appellants, partners in the Lucas Coal Company, own a strip mine in Butler County, which is identified by mining permit No. 174-5 (and amendments) issued under the Surface Mining Conservation and Reclamation Act, Act of May 31, 1945, P.L. 1198, *as amended,* 52 P.S. §1396.1 et seq. (prior to November 30, 1971, entitled the Bituminous Coal Open Pit Mining Conservation Act). The mine is contained within the larger geographical area covered by mine drainage permit No. 2866BSM39 (originally No. 365BMS1) issued in 1965 under The Clean Streams Law, Act of June 22, 1937, P.L. 1987, *as amended,* 35 P.S. §691.1 et seq.

In early 1972, Appellant William Lucas contacted Walter Kohler, then Chief of the mine drainage section of DER's Division of Surface Mine Reclamation,

to inquire about getting approval to dump pickle liquor sludge from the Armco Steel Corporation (Armco) plant into Appellants' strip mine. Mr. Kohler advised Appellants to request a backfilling variance or amendment to their mining permit to allow disposal of the sludge which is an industrial waste. Apparently, Mr. Kohler did not inform Appellants that any other DER permit had to be obtained. On May 22, 1972, Appellants wrote to Mr. Kohler requesting approval to amend their backfilling plans at *mining permit* Nos. 174-5A, 174-7 and 174-9. On May 26, 1972, Appellants received written approval from Mr. Kohler to place the sludge in the strip mine pit governed by *mine drainage permit* No. 3071BSM1 (permit No. 2866BSM39 was not referred to). Prior thereto, DER had a chemical analysis conducted on a sample of the Armco sludge.

On July 29, 1972, Appellants began dumping the Armco sludge into their strip mine area covered by mine drainage permit No. 2866BSM39 (rather than 3071BSM1) and mining permit No. 174-5 and amendments. On August 2, 1972, DER mine inspector Merle Urey made an inspection of the disposal site and asked to see Appellants' written authorization to conduct the operation. Upon being shown Mr. Kohler's letter of Approval, Mr. Urey pointed out that the permit did not cover the area of the actual dumping site. Appellants promptly wrote to Mr. Kohler, asking for a correction of the permit numbers. Appellants assert that Mr. Kohler then gave his approval of sludge disposal in the intended site over the telephone; no *written* approval was in evidence. However, after Appellants' second letter, Mr. Kohler—accompanied by Mr. Urey and W. E. Guckert, director of the Division of Surface Mine Reclamation —visited the disposal site. At that time, those DER

staff members gave no indication that Appellants lacked the authority to deposit the sludge at that particular site.

In August of 1972, during the sludge disposal operation, DER received complaints relating to the spillage of the sludge onto Butler County roads. Thereupon, DER initiated a suit in equity against the hauler and Armco in the Court of Common Pleas of Butler County seeking to enjoin the spillage. That suit resulted in a consent decree granting the hauler authority to continue transportation of the sludge "to locations where the Lucas Coal Company has obtained a permit from the Department of Environmental Resources for the disposal of such waste." On September 15, 1972, Walter Heine, Associate Deputy Secretary for Mines and Land Protection (supervisor of divisions of Surface Mine Reclamation and Solid Waste) issued a cease and desist order to Appellants stating that Appellants' surface mining permit amendment did not constitute a permit under the Pennsylvania Solid Waste Management Act (Solid Waste Act), Act of July 31, 1968, P.L. 788, as amended, 35 P.S. §6001 et seq.[1] and thus suspending Appellants' disposal operations. Appellants took no appeal and ceased operations. They received $55,-475.35 from Armco for the disposal of the sludge.

In April, 1974, a Mr. Kelly, who resided at a location adjacent to Appellants' property, complained to DER of contamination of his water supply allegedly stemming from Appellants' mining operations. As a result of the complaint, John Davidson, an environmental protection specialist with DER, collected water samples from the immediate vicinity of the mine from

---

[1] This case is unaffected by the new Solid Waste Management Act, Act of July 7, 1980, P.L. ——, No. 97.

March, 1974, until the spring of 1977. On May 18, 1977, DER ordered Appellants to A) submit within 60 days an application for an industrial waste permit to treat industrial wastes to meet certain standards B) reduce within 120 days the effluent from the mine to certain specified standards and C) furnish a $200,-000 bond within 30 days to assure financial responsibility for the continued treatment of industrial wastes. Appellants appealed that order to the EHB which issued an adjudication and order after extensive hearings. The EHB order deleted the requirement of a bond, affirmed the requirement that Appellants apply for a permit and modified the standards for the treatment of the effluent.

Our scope of review of an order of the EHB is limited by the Administrative Agency Law, 2 Pa. C. S. §704, "to a determination as to whether or not the findings of fact are supported by substantial evidence, whether or not an error of law was committed, or whether or not Appellant's constitutional rights were violated." *Pawk v. Department of Environmental Resources*, 39 Pa. Commonwealth Ct. 457, 461-62, 395 A.2d 692, 694 (1978).

For convenience and clarity, we will treat the cross-appeal separately. Initially, we address the Appellants' contentions.

### 1. *Need For Industrial Waste Permit*

Appellants first question whether the EHB committed an error of law in ordering them to apply for a new industrial waste permit, 1) when they already were in possession of an amendment to their mining permit granted under the Bituminous Coal Open Pit Mining Conservation Act, which the EHB held effectively constituted a permit to dispose of the Armco sludge, and 2) when the mine drainage and

industrial waste disposal permits issued to them in 1965, under The Clean Streams Law, authorized their discharge of industrial waste into the streams.

We do agree with the conclusion of EHB that Appellants' amended backfilling plan within its mining permit was equivalent to a permit issued under the Solid Waste Act to allow disposal of the sludge. That approval, however, cannot be construed as also granting Appellants permission to discharge industrial waste from the sludge or the inactive mine operation into Commonwealth waters. The approval made no reference to permitted discharge and contained no provisions for treatment in the event of discharge such provisions would have been contained in a proper industrial waste permit issued under The Clean Streams Law.

Furthermore, the two permits issued in 1965 do not authorize the industrial waste discharges that have occurred since Appellants' completion of its mining operations. Though Appellants apparently complied with the permits' parameters of acid, iron and pH during its mining operations, thereafter those parameters were exceeded. Accordingly, Appellants must apply for a new permit which would contain appropriate treatment parameters for all pollutants within the increased discharge.

The EHB is not ordering Appellants to apply for another permit to *dispose* of the industrial waste in their mines, but is requiring Appellants to apply for a permit for *treatment* to specific standards of all their industrial waste *discharges* entering the streams. The EHB has the statutory power and duty to "[f]ormulate, adopt, promulgate and repeal such rules and regulations *and issue such orders* as are necessary to implement the provisions of this act." (Emphasis added.) Section 5(b)(1) of The Clean

Streams Law, 35 P.S. §691.5(b)(1). Section 307 of The Clean Streams Law, 35 P.S. §691.307, requires such a permit to further the policy of both preventing any further water pollution and eliminating existing pollution; therefore it was necessary and correct for the EHB to order Appellants to apply for an industrial waste permit.

### 2. Establishing Standards on a Case-By-Case Basis

In its order, DER set forth specific limitations on the concentration of certain toxic substances that would be permitted in Appellants' effluent discharge. However, the EHB order provided that:

> Appellants shall prepare an industrial waste permit application to treat discharges to the specific water quality standards applicable to the Slippery Rock Creek Basin under Chapter 93 of 25 Pa. Code. In the process of reviewing appellants' application, the department may establish treatment parameters for the additional elements listed in paragraph B of its order only to the extent that they can be justified in relation to specific, current water uses and established toxicity levels.

The EHB held that there was not substantial evidence to support the specific limitations set forth in the DER order.

Appellants contend that EHB had no authority to permit DER to establish standards on a "case by case" basis. In concluding that the least that Appellants could be required to do is to treat the discharges in such a way as "to achieve minimum water quality standards as prescribed by law pertaining to the discharge of acid mine water into the waters of the Commonwealth," the EHB relied upon the lan-

guage of this Court in its order in *Commonwealth v. Barnes and Tucker Company,* 23 Pa. Commonwealth Ct. 496, 513-14, 353 A.2d 471, 481 (1976). Inasmuch as EHB found that DER failed to prove what the treatment parameters were for the elements found in Appellants' discharge, the EHB order states that once Appellants filed their application, DER must establish standards but they may not establish limits for the elements which are more restrictive than "can be justified in relation to specific, current water uses and established toxicity levels."

DER has the authority to develop specific limitations on polluting discharges. DER regulations allow discharge limitations to be established on such an individual case-by-case basis, for the language of 25 Pa. Code §93.5(a) reads in part:

> (a) The water quality criteria prescribed in this chapter for the various designated uses of the waters of this Commonwealth apply to receiving waters and are not to be necessarily deemed to constitute the effluent limit for a particular discharge, but rather one of the major factors to be considered in *developing specific limitations* on the discharge of pollutants. (Emphasis added.)

The water quality criteria set forth in 25 Pa. Code §93.7 (Tables 3, 4 and 5) have been expanded this year to include water quality standards for most of the toxic constituents found in the subject discharge (chromium, copper, fluoride, iron lead, manganese, nickel, zinc). For the substances not listed, the best scientific information available will be used to adjudge the suitability of a given waste discharge. 25 Pa. Code §93.7(f).

We are of the opinion that the EHB order is a practical solution to a procedural dilemma, to wit:

DER is required to set standards with which Appellants must comply but such limits must be based upon some reliable and ascertainable factual information. EHB found insufficient evidence of those standards in the record of this case but could not enter an order against Appellants requiring treatment without some standards. By ordering DER to set specific standards which must fall within certain limitations, EHB has protected the Appellants as well as the public. We find no error in this procedure.

Appellants contend that EHB erred when it did respect is a regulation required to be published by the provisions of the Commonwealth Documents Law, Act of July 31, 1968, P.L. 769, *as amended*, 45 P.S. §1102(12), is totally without merit.

### 3. *Causal Connection Between Sludge and Discharge*

Appellants' contention that the EHB order in this not require DER to prove a causal connection between the disposal of the Armco sludge and the leachate or discharge entering the waters in the immediate vicinity of the Appellants' mine. In fact, EHB did require DER to prove such a causal connection and found from substantial evidence that the burden had been carried by DER.

Appellants argue that it was impossible for DER to carry its burden of proof: 1) without necessary background data on the quality of the receiving stream's water prior to Appellants' mining operations and prior to their disposal of the sludge, or 2) without conducting "commonly recognized" scientific tests. Instead, Appellants argue, DER relied upon "assumption and guesses."

Of course, we may uphold the EHB's finding that leaching was resulting from Appellants' disposal of the Armco sludge if such a finding was based on substantial evidence. "If a regulatory agency desires to order the abatement of a violation of its regulations, it must meet its burden to prove that violation with substantial evidence. Nothing less will permit a reviewing court to affirm the action of the agency." *North American Coal Corp. v. Commonwealth,* 2 Pa. Commonwealth Ct. 469, 480, 279 A.2d 356, 362 (1971).

Here, the EHB, in arriving at its conclusion, relied on several types of evidence presented by DER amounting to more than mere inference, assumption, or speculation.

Thirteen down-gradient water samples taken in the area by DER from 1974 to 1977 indicated a high level of heavy metals (copper, chromium, nickel, and zinc) generally not associated with mine drainage. However, expert witnesses for *both* Appellants and DER agreed that the metals may occur at these levels in some areas.

It was the elevated levels of fluorides and sulfates found in these same samplings that the EHB emphasized in its findings. Appellants' witnesses testified that the fluoride levels found in the water samples were essentially unheard of in that part of the country, the samples showing at least three times the normal ground water concentrations. Samples of sludge taken from the Armco sludge lagoons clearly show that the sludge itself contains high levels of fluorides. According to a leachate test performed in DER's laboratory, when the sludge is placed in an acid environment, such as the spoil of Appellants' mine, and water is allowed to interact with it, leaching of the fluoride (and other elements) occurs. The

more acidic the environment, the more material is dissolved and is leached.

As further support for its conclusions, the EHB relied on evidence that the sulfate levels in the water samples were high, compared to the normal range of sulfate levels found in the vicinity of the Appellants' mine from January 20, 1969, through September 17, 1969. These levels were reported in a study made for DER known as the Operation Scarlift Report. Like the fluorides, high sulfates were found in the Armco sludge itself; and thus the EHB concluded that high sulfate levels in the water were also the result of leaching.

In addition to the samples showing increased fluoride and sulfate contents, the EHB relied on evidence as to the nature of the sludge, its location in an acid environment, and the geologic conditions of the site—such as the southeasterly direction of the dip toward the main discharge point of the mine.

Appellants contend that there can be no direct evidence of leaching without background data on the quality of the stream water before Appellants started mining and before disposal of the sludge. A background analysis of the receiving stream, which could be compared to an analysis after sludge disposal, admittedly would have constituted the best evidence of a change in water quality. We note, as did the EHB, that had Appellants followed the normal procedure to obtain a solid waste permit, DER automatically would have undertaken a study of the quality of the receiving stream prior to issuing such a permit. But the impossibility of DER's obtaining such evidence now should not prevent DER from attempting to prove its case by other means. Failure to do the impossible will not prohibit DER from enforcing the law and its rules and regulations. *United States*

*Steel Corp. v. Department of Environmental Resources,* 7 Pa. Commonwealth Ct. 429, 300 A.2d 508 (1973).

Appellants also find fault with DER's failure to conduct "any commonly recognized scientific tests such as *monitoring wells, tracer studies, bromide studies, electric resistivity, or pumping tests* which would have proved whether or not the sludge was leaching." The EHB, however, finds it reasonable that DER conducted no tracer studies, because DER believed that the presence of fluorides in the discharge acted as a tracer study. The EHB finds DER's evidence substantial without its utilization of other tests. We agree, for the evidence does not consist of inadequate visual tests and observations, which would necessitate the use of available scientific tests as in *Bortz Coal Co. v. Commonwealth,* 2 Pa. Commonwealth Ct. 441, 279 A.2d 388 (1971). Rather, the evidence consists of experts' scientific samplings, studies, and reports adjudged credible by the fact-finding EHB. Therefore, we believe the evidence is substantial in amount and quality to form the basis of the EHB conclusion that the sludge was leaching and that it was the cause of the pollution in the water in the immedite vicinity of Appellants' mine.

### 4. *Prejudging of Case and Failure to Require DER to Furnish Copies of Reports*

We find no evidence in the record to uphold Appellants' contention that the Hearing Examiner decided the case before any testimony or evidence was received. We find no error of law in the Hearing Examiner's rulings on hearsay evidence, keeping in mind that "Commonwealth agencies shall not be bound by technical rules of evidence at agency hear-

ings, and all relevant evidence of reasonably probative value may be received." Administrative Agency Law, 2 Pa. C. S. §505.

Appellants also claim that the EHB erred in failing to require DER's counsel to furnish to Appellants' counsel various documents and files in accord with an EHB order of July 25, 1977 granting Appellants' motion for discovery and production of documents. We find that at the 1978 hearings, the EHB properly ruled that certain documents were not discoverable, being material prepared or obtained in anticipation of litigation. 1978 Pa. Rules of Court, Pa. R.C.P. No. 4011(d). Moreover, we cannot conclude that DER's introduction into evidence of reports and other evidence was in any way prejudicial to Appellants. We find no error of law.

Now, we proceed to a consideration of DER's cross-appeal.

### 1. *A Valid Solid Waste Permit?*

DER contends that the EHB erroneously found that Appellants obtained a valid solid waste permit, because they failed to comply with the explicit requirements of the Solid Waste Act.[2]

Initially, we note that whether or not Appellants were issued a valid authorization to dispose of the Armco sludge has no bearing on whether Appellants should be held responsible for subsequent polluting discharges.

---

[2] Section 7(a) of The Solid Waste Act, 35 P.S. §6007(a) provides in pertinent part:

(a) It shall be unlawful for any person, municipality, county or authority to use or continue to use their land or the land of any other person, municipality, county or authority as a solid waste processing or disposal area of a solid waste management system or transport solid wastes to a mine without first obtaining a permit from the department.

Additionally, we concur with EHB's conclusions that Appellants' complete compliance with DER's specific directions for approval of their plan to dispose of the sludge constituted a de facto approval by DER notwithstanding Appellants' admitted failure to comply with the permit requirements of the Solid Waste Act and that Appellants should not suffer because of departmental confusion.

However, we hasten to add that our holding here is limited to the facts of this case and does not affect cases involving sludge disposal after the effective date of the formal DER policy relating to sludge disposal, *i.e.* September 6, 1973.

## 2. *Posting of a Bond*

DER contends that the EHB erred in dismissing Paragraph C of DER's order, which required Appellants to post a bond in the amount of $200,000 to assure financial responsibility for the continued treatment of the industrial wastes discharged. The EHB concluded in its decision that although DER may have the power to require posting of a bond under The Clean Streams Law, it would not sustain such an order absent a showing of necessity for the bond. Finding no proof of necessity here, the EHB deleted the bond requirement.

DER argues that authority for DER's requiring a bond is found in Section 7.1(a)(2) of the Solid Waste Act, 35 P.S. §6007.1(a)(2), which reads:

(a) In addition to the foregoing requirements, before granting any permit for the disposal of solid wastes in mines or for the transportation thereof for said purpose, the department shall, as applicable:

. . .

(2) Except in the case of a municipality, county or authority which is directly performing the operations, require the posting of a bond sufficient to assure the financial responsibility of the operator, including the restoration of the area.

We agree that this statutory section imposes no condition of showing necessity for the bond on DER, for it is a mandatory requirement. However, DER concedes as it must, that the mandatory bond requirement pertains only to the granting of a solid waste permit. DER contends that inasmuch as Appellants should have acquired such a permit, the bond requirement should apply. The argument is fatally flawed by the clear statutory language which requires the bond as a *condition precedent* to the granting of a solid waste permit. Since no such permit was granted here, DER cannot utilize that statutory requirement for a bond in the instant case.

Though the bonding requirement of Section 7.1 (a)(2) of the Solid Waste Act does not apply to this case, we do find authority for requiring a bond under Section 610 of The Clean Streams Law, 35 P.S. §691.610, to assure abatement of pollution caused by Appellants' sludge disposal. However, Section 610 clearly requires that before the issuance of an enforcement order, such as one to post a bond, the order must be shown necessary to effect the purposes of The Clean Streams Law. In pertinent part, Section 610 states:

The department may issue such orders as are necessary to aid in the enforcement of the provisions of this act. . . The department may, in its order, require compliance with such conditions as are necessary to prevent or abate pollution or effect the purposes of this act.

We agree with the EHB that DER did not show the necessity for posting of a bond as required, and thus we uphold its dismissal of Paragraph C. of DER's order.

### 3. *Effluent Limits Presumed Valid?*

DER also contends that its case-by-case determination of effluent limits for toxic substances and the standards on which these limits are based must be given the presumption of validity once DER's expert witnesses have formulated these limits and standards based on the best scientific information available. Furthermore, DER asserts that Appellants, rather than DER, bear the burden of proof with regard to necessary treatment standards.

We disagree that Appellants have the burden of proof to rebut DER's treatment standards set forth in its order. The facts of this case do not fall within the exception to the general rule that DER has the burden of proof when it orders a party to abate water pollution. 25 Pa. Code §21.101 (formerly 25 Pa. Code §21.42).

EHB was correct in ordering that DER establish a basis for the unique effluent standards it wishes to impose after reviewing Appellants' application for an industrial waste permit. Since the effluent limits in DER's order are to apply specifically to Appellants, being determined on an individual basis, it is reasonable that DER be slightly burdened with justifying the basis for its standards.

It appears as though the EHB is asking DER to do no more than explain briefly how it arrived at each figure set forth in its order, or, in other words, to justify the standards by pointing to the specific EPA guidelines and other factors it considered. It is not a matter of *proving* the basis for the parameters,

but a matter of justifying the basis. By affirming the EHB's request for a justification, we are not disputing the ability of DER's experts, nor trying to substitute our own judgment.

The recent expansion of DER's water quality criteria standards in 25 Pa. Code §93.7 may make easier DER's task, but it does not change our opinion that DER's standards are not presumed valid. For according to 25 Pa. Code §93.5(a), *supra,* these criteria are to be considered only as "one of the major factors" in developing discharge limitations. DER must explain the link between these water quality standards, the other factors it considered and the parameters it wishes to establish.

### 4. *Abatement of a Public Nuisance*

DER argues finally that the EHB's conclusion that "the Appellants would be responsible for acid mine drainage resulting from the operation for as long as it continues" is not the proper standard, but rather that Appellants' responsibility to abate a public nuisance continues until the nuisance is abated, regardless of economic considerations and subsequent determinations of fault.

Our interpretation of EHB's conclusion as to Appellants' duty to abate the public nuisance leads us to hold that the EHB committed no error of law in this regard. A reading of the EHB's discussion in conjunction with its conclusions of law clearly indicates that it is properly imposing on Appellants a duty to abate any post-mining discharges resulting from their disposal of industrial wastes *and* any acid mine discharges resulting from their mining operations in general. The EHB found from the facts that although there was a pre-existing acid mine discharge on Appellants' property when they started

mining, the discharge increased during Appellants' operations and thus resulted from Appellants' operations. We agree with the EHB that ''[i]t is clear that an operator may be required to treat acid mine drainage resulting from this operation even though it includes water from prior abandoned mining operations.''[3]

The EHB is not imposing a fault limitation on Appellants' duty to abate. Its decision indicates to us that Appellants shall treat the discharges *as long as they continue,* because they have resulted from Appellants' operations. DER will not have to prove again at future intervals that the discharges are the direct result of Appellants' past operations. Unless a new factor is introduced in the future, which influences the discharge, Appellants will be held strictly liable for abating the discharge.

Neither has the EHB imposed an economic limitation on Appellants' duty to abate by its statement that it is ''especially concerned that appellants not be charged with excessive or unreasonable treatment costs.'' The EHB expressly and properly states that Appellants cannot be absolved from *liability* because of cost. However, the EHB is also appropriately concerned with exercising the police power in a reasonable and not unduly oppressive manner, which

---

[3] The Supreme Court in *Commonwealth v. Barnes and Tucker Co.*, 472 Pa. 115, 126, 371 A.2d 461, 466-67 (1977), known as *Barnes and Tucker II*, recognized that:

'Whether the impelling force which produced the public nuisance is solely or partially that of fugitive mine water flowing into and adding to the generated water of that mine *the conduct of Barnes & Tucker in its mining activity remains the dominant and relevant fact without which the public nuisance would not have resulted where and under the circumstances it did.*' (Emphasis in original.)

means considering the differing economic impacts on Appellants of the several effective remedial measures. We disagree with DER's contention that the Supreme Court decision in *Barnes and Tucker II, supra,* requires DER to select an abatement method, without regard to whether other treatment methods might be less expensive. We sustain EHB's conclusions regarding Appellants' duty to abate.

For the above reasons, we affirm the decision and order of the EHB.

### ORDER

AND Now, this 3rd day of September, 1980 the order of the Environmental Hearing Board, dated May 23, 1979, dismissing in part and sustaining in part an order of the Department of Environmental Resources, is hereby affirmed.