625 A.2d 741

**CONSOLIDATED RAIL CORPORATION, Petitioner,**

**v.**

**PENNSYLVANIA PUBLIC UTILITY COMMISSION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Feb. 1, 1993.

Decided May 13, 1993.

538

Thomas E. Reinert, Jr., for petitioner.

David A. Salapa, Asst. Counsel, for respondent.

Thomas P. Shearer for intervenor United Transp. Union.

Before DOYLE and FRIEDMAN, JJ., and SILVESTRI, Senior Judge.

DOYLE, Judge.

Consolidated Rail Corporation (Conrail) appeals an order of the Public Utility Commission (Commission) sustaining the complaint of United Transportation Union (UTU) which prohibited Conrail's operation of light engines in the long nose configuration with only one engineer.

This matter began on May 26, 1983, when the UTU filed a complaint with the Commission alleging that Conrail was operating "light engines"[1] in Pennsylvania with only one engineer and that such operating practice was unsafe. The complaint sought abatement of this practice by any means other than requiring additional crew members.[2]

1. "Light engine" is the term used to describe locomotives without any railroad cars attached.

2. UTU had also filed a complaint with the Commission, not under consideration here, alleging that the light engine operations were unsafe, but requesting the addition of a second crew member as a remedy.

On July 25, 1983, Conrail filed a motion to stay the complaint arguing that UTU's complaint was essentially an attempt to regulate railroad crew sizes and that federal law specified that the Special Court, Regional Rail Reorganization Act of 1973 (Special Court), 45 U.S.C. §§ 1101–1116, had exclusive jurisdiction over such matters. The Commission denied the motion by order of January 9, 1984, concluding that while UTU's complaint might indeed involve issues of crew size, it also concerned safety issues which the Commission was specifically empowered to address. Subsequently, on August 30, 1984, the Special Court issued a decision finding that the Commission was not preempted by federal law from regulating crew size of light engines in the interests of safety and thus denying Conrail's previously filed request for declaratory judgment and injunctive relief.[3]

Following these preliminary motions, the complaint was assigned to an Administrative Law Judge (ALJ) for hearings which were held from December 1985 to September 1986. Conrail also conducted a demonstration of a single man light engine movement at its Conway, Pennsylvania facility (Conway demonstration). At this point, UTU narrowed the scope of its complaint by abandoning any challenge to the safety of single-man light engine movements in the "short nose" orientation.[4]

> Conrail responded to this complaint by filing an action in the Special Court, Regional Rail Reorganization Act, 45 U.S.C. §§ 701–797m, *as amended,* seeking to enjoin UTU from prosecuting this complaint before the Commission. UTU agreed to hold the prosecution of this complaint before the Commission in abeyance pending the decision of the Special Court.

**3.** Conrail has filed a motion for reconsideration which is currently pending before the Special Court.

**4.** Conrail's freight locomotives are designed so that the engineer's compartment, or cab, is not located in the center of the engine. Instead, the cab is located further towards one end of the engine. The shorter portion of the engine, relative to the position of the cab, is called the "short nose" or "short hood." The short hood houses a small compartment which contains, among other things, the engineer's lavatory. The longer portion of the engine, relative to the position of the cab, is called the "long nose" or "long hood." The long hood contains the diesel engines.

The ALJ issued a recommended decision on October 2, 1990 concluding that UTU had failed to meet its burden of proving that single-man light engine operations, in either orientation, were unsafe and recommending that the complaint be dismissed. The UTU filed exceptions on November 6, 1990, and on January 10, 1991, the Commission remanded the case to the ALJ for the purpose of conducting a second field demonstration. This second demonstration, which was attended by at least one of the Commissioners, was held on May 15, 1991, at Conrail's Juniata yard in Altoona, Pennsylvania (Juniata demonstration).

The Commission issued a tentative decision on April 15, 1992, in which it found that the operation of a light engine with a single engineer was unsafe and unduly hazardous in both the long and short nose orientations. Conrail filed exceptions to the tentative decision and brought to the Commission's attention the fact that UTU had withdrawn its allegation that single-man light engine operation was unsafe in the short nose orientation. The Commission issued a final order on June 4, 1992 limiting the prohibition to single-man long nose operation. This appeal followed.[5]

As a preliminary matter, Conrail maintains that the Commission has exceeded its limited jurisdiction over local safety matters and intervened in a railroad crew size dispute which is more appropriately addressed through collective bargaining. The core of this argument is Conrail's contention that the Commission's order is a "manning" order and that UTU's sole interest in filing its complaint is to provide more work for its union members. As evidence of UTU's real

Light engines are said to be operated in either a "short nose forward" or "long nose forward" orientation depending upon which end of the engine is oriented in the direction of forward movement when the engine is dispatched.

5. Our review of the Commission's decision is limited to a determination of whether constitutional rights have been violated, errors of law have been committed, findings of fact are supported by substantial evidence, or whether the Commission has violated its rules of practice. *Pittsburgh and Lake Erie Railroad Company v. Pennsylvania Public Utility Commission,* 124 Pa.Commonwealth Ct. 611, 556 A.2d 944 (1989).

interest, Conrail cites a recent collective bargaining agreement between Conrail and UTU which leaves the manning of light engines to Conrail's discretion.

Conrail alleges that "the existence of this recent agreement with the UTU completely undermines the UTU's alleged safety concerns, on which the Commission has relied." Conrail's Main Brief at 67. Conrail's argument misses the point. First, Conrail fails to cite any authority for the proposition that a collective bargaining agreement can limit the Commission's ability to prohibit an unsafe practice.[6] Second, the motive of UTU is completely irrelevant. Upon review of the evidence presented, the Commission concluded that single-man long nose operation is unsafe. The Commission is authorized to regulate the safety of public utilities, *see* Section 1501 of the Public Utility Code (Code), 66 Pa.C.S. § 1501, and it in no way exceeded its jurisdiction.[7]

Turning to the merits of the case, Conrail maintains that the Commission's order is not based upon definite, consistent, and detailed findings and that the order must thus be reversed. Specifically, Conrail alleges that the Commission ignored relevant evidence and instead of independently reviewing the evidence, relied on UTU's exceptions to the ALJ's recommended decision.

■ Section 703(e) of the Code, 66 Pa.C.S. § 703(e), requires decisions of the Commission to be accompanied by findings which "shall be in sufficient detail to enable the court

6. At most, this "admission" in the collective bargaining agreement could have served to preclude UTU from arguing that Conrail's practices were unsafe. This would still not prevent the Commission from concluding that UTU was wrong and that the practice was indeed unsafe; the Commission's goal is to regulate public utilities in the public's interest, not to protect the interests of the parties.

7. Any suggestion that the Commission's action is preempted by federal law must be summarily rejected under the principles of collateral estoppel; the Special Court specifically found that "the PUC's authority to regulate light engine operations in the interest of railroad safety is not preempted, even if that regulation may in some instances require an additional crew member." Opinion of Special Court at 4. Further, the Special Court concluded that the PUC's action in this case was "solely related to job safety" and that the "PUC's orders cannot be construed as job protection measures." *Id.* at 6.

on appeal, to determine the controverted question presented by the proceeding, and whether proper weight was given to the evidence." This section has been interpreted to mean that an order is sufficient if it refers to facts in the record supporting the conclusion, and it is not necessary that each and every issue raised by the parties be discussed. *See Paxtowne v. Pennsylvania Public Utility Commission*, 40 Pa.Commonwealth Ct. 646, 398 A.2d 254 (1979); *Allegheny Center Associates v. Pennsylvania Public Utility Commission*, 131 Pa.Commonwealth Ct. 352, 570 A.2d 149 (1990).

■ Our review of the Commission's decision convinces us that it is sufficiently detailed to allow our review. The tentative decision, which was adopted in large part in the final decision, relied on, and quoted at length from, UTU's exceptions to the ALJ's decision. The quoted exceptions include detailed references to record evidence, and the Commission's reference to the exceptions provides a clear articulation of the reasons underlying the decision.

■ There is nothing inherently objectionable in the Commission's reliance on UTU's exceptions as a means of explaining the basis for its conclusions. As noted above, these exceptions contained specific citations to record evidence and there is nothing to suggest that the Commission did not independently review this evidence in reaching its decision. It is apparent that the Commission assessed the evidence and then merely adopted UTU's articulation of the pertinent safety concerns.

It is also apparent that, contrary to Conrail's assertion, the Commission did consider all the relevant evidence. Conrail argues that the Commission summarily ignored evidence concerning Conrail's safety record, engineer visibility, and various other matters tending to show that single-man light engine operation is safe. This assertion is belied by the final decision which specifically discusses Conrail's safety record and engineer visibility on the right side of the track. *See* Final Decision at 10–11.

Although Conrail may disagree with the conclusions reached, the final decision of the Commission references these issues and demonstrates that contrary evidence was at least considered. And while it is true that the decision discusses only that testimony supporting its conclusion, *i.e.*, that Conrail's single-man long nose operation is unsafe, this does not mean that contrary evidence was not considered. Again, we note that the Commission is not required to reference and discuss every single argument or item of evidence presented by the parties. *Allegheny Center Associates.*

Conrail also argues that the record evidence overwhelmingly demonstrates the safety of its light engine operations and, in its brief, Conrail engages in a detailed review of the evidence it presented tending to show that single-man light engine operations in the long nose direction are safe. Conrail's argument in this respect amounts to an assertion that the Commission could not have reached the conclusion that it reached if it considered the evidence presented by Conrail. This is just another way of saying that the Commission should have accepted Conrail's evidence and rejected UTU's evidence as not credible. Of course, Conrail's argument is unavailing here because the Commission is the ultimate fact finder in such matters, and its credibility determinations are beyond our review on appeal. *AT & T Communications of Pennsylvania v. Pennsylvania Public Utility Commission,* 130 Pa.Commonwealth Ct. 595, 568 A.2d 1362 (1990).

■ Conrail's final contention is that the Commission's decision is not supported by substantial evidence. Our review of the record reveals that substantial evidence supporting the Commission's decision does exist. UTU presented the testimony of several railroad employees experienced in the operation of locomotives. All of these employees testified to visibility problems on the right side of the engine which existed when engines are operated long nose forward with only one engineer.[8]

8. When the engine is operated with the short nose forward, the engineer's controls are on the right side of the cab relative to forward movement, and thus visibility is better. When engines are operated

The substance of this testimony was that the engineer's controls are on the left side of the cab when the engine is moving long nose forward, and thus, an engineer is forced to look across the long body of the engine when looking to the right of the track. This configuration creates a blind spot which even Conrail's witnesses admitted to. *See* N.T. at 536. While Conrail's witnesses and exhibits characterized this blind spot as insignificant relative to the normal distance required to stop a light engine, UTU's witnesses testified that the reduced visibility created a safety hazard.

One engineer testified that visibility is "very, very poor" on the right side of an engine when operating in the long nose orientation and that it was sometimes necessary to stop the engine and walk to the other side of the the cab in order to observe signals on the right side of the track. This practice presents a safety problem because a signal could change after the engineer had crossed the cab to check on it. N.T. at 49. This testimony was reiterated by another engineer who testified that he had difficulty seeing signals when operating alone in the long nose direction and that such difficulty was alleviated when an additional crew member was present. N.T. at 112. Two of UTU's witnesses also testified that when operating long-nose forward they could not see the track ahead of the engine when the track curved to the right, presenting obvious safety concerns. N.T. at 60, 92–94.

Conrail argues that the testimony of its witnesses established that the blind spot ahead of an engine operating in the long nose direction was only 100 feet and that thus the Commission's adoption of UTU's exception stating that vision was totally obscured is erroneous. While we agree that no witness testified that vision was totally obscured, this fact does not undermine the Commission's finding that the practice is unsafe because the evidence cited above provides support for that conclusion. Likewise, the fact that one of Conrail's witnesses testified that wayside signals on the right side of the

long nose forward, however, the engineer's controls are on the left side, relative to forward movement, and thus there is reduced visibility on the right side of the track.

track are visible more than 100 feet beyond the engine, and that this distance is not a significant safety factor, is irrelevant because UTU's witnesses testified that they had difficulty seeing these signals, that they believed it affected the safety of long nose operations and the Commission, the ultimate finder of fact, accepted this testimony as credible.

Accordingly, the order of the Commission is affirmed.

## ORDER

NOW, May 13, 1993, the order of the Pennsylvania Public Utility Commission in the above-captioned matter is hereby affirmed.

SILVESTRI, Senior Judge, dissents.