**SPRINGFIELD TOWNSHIP, Petitioner,**

v.

**PENNSYLVANIA PUBLIC UTILITY COMMISSION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Feb. 5, 1996.
Decided May 17, 1996.

Joseph B. Siedlarz, for Petitioner.

Vilna Waldron Gaston, for Intervenor, PECO Energy Company.

Susan T. Povilaitis, for Respondent.

Before COLINS, President Judge, FLAHERTY, J., and MIRARCHI, Senior Judge.

MIRARCHI, Senior Judge.

Springfield Township (Township) appeals from an order of the Pennsylvania Public Utility Commission (PUC) which dismissed the Township's complaint against the PECO Energy Company (PECO), formerly the Philadelphia Electric Company, and denied the Township's request for a refund of portion of electric bills paid from July 4, 1986 to July 6, 1993.

The relevant facts found by the Administrative Law Judge (ALJ) and PUC are as follows. In 1970, the Department of Transportation (DOT) installed seventy photoelectrically-controlled sodium vapor street lighting fixtures (DOT-installed street lights) along Sproul Road, Springfield Township, Delaware County, when it reconstructed the intersection at State Road and Sproul Road. Since at least November 1983, electric charges for the DOT-installed street lights were billed under the GS (General Service) rate to two accounts which were in the Township's name. The GS account is a standard metered account for nonresidential customers served at secondary voltage. DOT

shared the costs of maintaining those street lights with the Township by reimbursing the Township 50% of the electric charges.

PECO never owned or maintained the DOT-installed street lights. PECO owned, however, all other street lights (PECO-owned street lights) in the Township. The PECO-owned street lights were billed to its customers, including the Township, under the SL–S (Street Lighting–Suburban) rate.

In July 1986, PECO established the SL–E (Street Lighting–Energy) rate applicable to street lights. The PECO's Tariff provided as follows as to the availability of the SL–E rate:

### RATE SL–E STREET LIGHTING CUSTOMER–OWNED FACILITIES

### AVAILABILITY

To any governmental agency outside of the City of Philadelphia for outdoor lighting of streets, highways, bridges, parks or similar places, including directional highway signs at locations where other outdoor lighting service is established hereunder for the safety and convenience of the public where all of the utilization facilities, as defined in Terms and Conditions in this rate schedule, *are installed, owned and maintained by a governmental agency.* (Emphasis added.)

In 1987, John Nahill, PECO's former energy account representative contacted the Township manager, Michael Lefevre, and advised him that the Township would save in its electric bills for the PECO-owned street lights by purchasing and maintaining them and paying the bills under the SL–E rate, rather than the SL–S rate. Thereafter, the Township and PECO negotiated the Township's purchase of the PECO-owned street lights. While conducting an audit of the street lights existing in the Township, Robert Artese, the Township's employee in its Traffic and Street Light Department, noticed that the map provided by PECO did not include the DOT-installed street lights.[1] In

October 1987, the Township purchased all PECO-owned street lights, and the rate for those street lights was changed from the SL–S to SL–E rate. The DOT-installed street lights were not part of that transaction.

In January 1993, David Anderson, an energy consultant, was hired by the Township to perform a utility rate and cost reduction analysis. On March 16, 1993, Anderson contacted James Kelly, PECO's senior energy account representative, and questioned why the DOT-installed street lights were billed at the GS rate, rather than the SL–E rate. Anderson orally requested a rate change from the GS to the SL–E rate on March 25, 1993 and followed up his oral request with a written request on April 16, 1993.

After receiving Anderson's written request, Kelly requested information from the Township concerning the wattage and the location of the street lights. He also arranged a meeting with Anderson, Artese and a PECO's technician at the site of the street lights. The purpose of the meeting was to determine what should be done to change the accounts from the metered GS accounts to unmetered SL–E accounts. Kelly did not believe that the requested rate change could be done by a simple book entry. He was also concerned about the presence of the unusual 440–volt transformer and the effect of removal of meters on the traffic lights at the busy intersection.

After the May 4, 1993 meeting, Kelly sent a letter to the Township, requesting its acknowledgment that when the accounts are changed to unmetered SL–E accounts, PECO's responsibilities end at the transformer connections, and that the Township is responsible for maintaining the lights and all underground wiring and secondary feeds at the light locations. The Township executed the acknowledgment on June 11, 1993. Kelly thereafter met with Artese and PECO's personnel at the site to make sure that the removal of the meters would not cause any problems. PECO changed the rate for the DOT-installed street lights from the GS to the SL–E rate, effective July 6, 1993.

---

1. Upon Artese's request, Nahill later provided Artese with a map prepared by DOT, which in-

cluded the DOT-installed street lights.

On November 12, 1993, the Township filed a formal complaint against PECO, alleging that the Township owned the DOT-installed street lights and that PECO was therefore required to compute the electric bills under the SL–E rate from July 4, 1986, when such rate was established, pursuant to Section 1303 of the Public Utility Code (Code), 66 Pa.C.S. § 1303, which provides:

No public utility shall, directly or indirectly, by any device whatsoever, or in anywise, demand or receive from any person, corporation, or municipal corporation a greater or less rate for any service rendered or to be rendered by such public utility than that specified in the tariffs of such public utility applicable thereto. The rates specified in such tariffs shall be the lawful rates of such public utility until changed, as provided in this part. *Any public utility, having more than one rate applicable to service rendered to a patron, shall, after notice of service conditions, compute bills under the rate most advantageous to the patron.* (Emphasis added.)

The Township requested that PUC order PECO to refund the difference between the GS and the SL–E rates from July 4, 1986 to July 6, 1993, the effective date of the rate change, plus interest, or in the alternative, the difference of the rates from March 25, 1993, the date of its oral request for the rate change, to July 6, 1993, plus interest.

In its answer and new matter, PECO alleged that under Section 1303 of the Code, it had no duty to change the rate until the Township requested the rate change in writing and that PECO changed the rate within a reasonable time after the Township's request.[2]

To support the alleged ownership of the DOT-installed street lights, the Township presented the testimony of its manager that it was his understanding that the Township acquired the ownership of those street lights

from DOT by either a gift or a purchase before the SL–E rate was established in 1986. However, he could not find any documents supporting such gift or purchase, or any arrangement made between the Township and DOT regarding the electric bills. He further testified that the Township had maintained the DOT-installed street lights since it purchased the PECO-owned street lights in October 1987.

■ ALJ found that the Township failed to establish that it ever notified PECO of its eligibility for the SL–E rate, i.e., its ownership and maintenance of the DOT-installed street lights; the Township did not request the rate change for those street lights until March 25, 1993; and PECO changed the rate in a reasonable time following the Township's request. ALJ denied the Township's request for a refund and dismissed the complaint, concluding that under Section 1303 of the Code, a public utility must have actual notice of service conditions before it is required to compute bills under a more advantageous rate and that the Township failed to prove PECO's actual knowledge of the Township's ownership and maintenance of the DOT-installed street lights. PUC subsequently denied the Township's exceptions and adopted ALJ's initial decision. The Township's appeal to this Court followed.[3]

■ Section 1312 of the Code, 66 Pa. C.S. § 1312, authorizes PUC to order a public utility to refund the rates which were (1) unlawful, (2) unjust or unreasonable, or (3) in excess of the rates contained in the public utility's tariff. *National Fuel Gas Distribution Corp. v. Pennsylvania Public Utility Commission,* 76 Pa.Cmwlth. 102, 464 A.2d 546 (1983). The Township contends that PECO violated Section 1303 of the Code in failing to compute the bills for the DOT-installed street lights under the more advantageous SL–E rate and therefore must re-

2. PECO also alleged that a portion of the Township's claim for the refund was barred by the statute of limitations and/or laches. The Township concedes that pursuant to Section 1312 of the Code, 66 Pa.C.S. § 1312, it can only seek a refund of its payments made "within four years prior to the date of the filing of the complaint" on November 12, 1993.

3. This Court's scope of review of an adjudication by PUC is limited to determining whether PUC violated constitutional rights or committed an error of law, or whether its findings are supported by substantial evidence. *Pocono Water Co. v. Pennsylvania Public Utility Commission,* 158 Pa.Cmwlth. 41, 630 A.2d 971 (1993).

fund the difference of the GS and SL–E rates. The Township, as a complainant, has the burden of establishing all of the elements of PECO's alleged violation of Section 1303. Section 332(a) of the Code, 66 Pa.C.S. § 332(a).

Under Section 1303 of the Code, the public utility has an obligation to compute the bills under the rate most advantageous to its customers "after notice of service conditions." Consequently, to establish PECO's violation of Section 1303, the Township must establish not only the applicability of the SL–E rate to the DOT-installed street lights, but also PECO's notice of service conditions of those street lights during the period in question.

Under the terms of the PECO's Tariff, the SL–E rate is applicable to street lights installed, owned and maintained by a governmental agency. In denying the request for the refund, ALJ stated that at the time of the Township's purchase of the PECO-owned street lights in 1987, the Township was not maintaining the DOT-installed street lights, and that it was questionable whether the Township in fact owned the DOT-installed street lights at that time. The ALJ's Decision, P. 25. However, ALJ and PUC did not make a specific finding as to the Township's ownership and maintenance of the DOT-installed street lights prior to the Township's March 25, 1993 oral request for the rate change. PUC's decision was based upon the Township's failure to establish PECO's actual knowledge of the Township's ownership and maintenance of those street lights before the oral request, not upon the applicability of the SL–E rate to those street lights.

Previously, in *City of Pittsburgh v. Duquesne Light Co.,* 54 Pa. P.U.C. 460 (1980), PUC determined that to establish a public utility's obligation to compute the most advantageous rate under Section 1303 of the Code, the complainant must establish the public utility's actual, not constructive, notice of service conditions. PUC reasoned: "Utilities cannot be expected to know more about their customers' businesses than the customers themselves and cannot be expected to make their decisions for them. A utility is not the co-manager of its customers' opera-

tions." *Id.* at 462. *See also Mauro v. Duquesne Light Co.,* 69 Pa. P.U.C. 105 (1988).

■ Under the Code, PUC is responsible for regulating utility rates and evaluating proposed tariffs, and as such, it has the particular expertise over such matters. *Optimum Image, Inc. v. Philadelphia Electric Co.,* 410 Pa. Superior Ct. 475, 600 A.2d 553 (1991). Therefore, this Court must defer to PUC's interpretation of the governing statute, regulatory pronouncements and the terms of the tariff in reviewing a PUC's decision. *W.C. McQuaide, Inc. v. Pennsylvania Public Utility Commission,* 137 Pa. Cmwlth. 282, 585 A.2d 1151 (1991); *Equitable Gas Co. v. Pennsylvania Public Utility Commission,* 106 Pa.Cmwlth. 240, 526 A.2d 823 (1987), *appeal denied,* 516 Pa. 644, 533 A.2d 714 (1987).

■ In this matter, we agree with PUC that the imposition of an affirmative duty upon the public utility to continually monitor its customers' accounts for the purpose of computing the most advantageous rate would be unreasonable. The unreasonableness of placing such duty on the public utility is demonstrated in this matter by the testimony of William Sundermeir, PECO's supervisor in charge of electric rates. Sundermeir testified that whether a GS account is for street lighting cannot be determined by merely examining the account itself or by visually examining the electric pole and transformer because other loads could be served by the same pole and transformer. We hold, therefore, that under Section 1303 of the Code, the public utility must have actual knowledge of service conditions before it is required to compute the most favorable rate for its customers.

The PECO's Tariff 11.1 and 11.2 provide the procedures for selecting rates more favorable to its customers under Section 1303 of the Code:

11.1 CHOICE OF RATE. Where the class of service-supply or conditions of use are such that two or more rates are available, an applicant shall select the rate or rates to be applied to his service.

11.2 COMPANY ASSISTANCE. The Company upon request will, to a reason-

able extent, assist an applicant in selecting the most advantageous rate or rate application.

■ A public utility's tariff, containing schedules of rates, contracts involving rates, and all rules, regulations and practices, has the force of law and therefore is binding on both the public utility and its customers. *Brockway Glass Co. v. Pennsylvania Public Utility Commission,* 63 Pa.Cmwlth. 238, 437 A.2d 1067 (1981).[4] Pursuant to the procedures provided in the PECO's Tariff 11.1 and 11.2, the Township was required to select the favorable rate before invoking PECO's obligation to compute the bills under the SL–E rate.

In the matter *sub judice,* the record fails to demonstrate that before its March 25, 1993 oral request for the rate change, the Township ever notified PECO of its ownership and maintenance of the DOT-installed street lights, or requested the rate change or PECO's assistance in selecting the more favorable rate. At the hearing, the Township manager admitted that he never discussed the DOT-installed street lights with PECO's account representative, when negotiating the Township's purchase of the PECO-owned street lights. Consequently, the Township failed to establish that PECO was obligated before March 25, 1993 to compute the bills under the SL–E rate pursuant to Section 1303 of the Code.

■ The Township also challenges PUC's conclusion that the Township failed to prove an unreasonable delay by PECO in changing the rate pursuant to the Township's March 25, 1993 oral request. However, that issue was not raised by the Township in its exceptions to ALJ's initial decision and was not considered by PUC. Therefore, the issue was waived and may not be considered on appeal. Pa.R.A.P. 1551(a); *Pennsylvania*

*Power Co. v. Pennsylvania Public Utility Commission,* 127 Pa.Cmwlth. 97, 561 A.2d 43 (1989), *aff'd,* 526 Pa. 453, 587 A.2d 312 (1991), *cert. denied,* 502 U.S. 821, 112 S.Ct. 80, 116 L.Ed.2d 53 (1991).[5]

■ Finally, the Township contends that ALJ improperly accepted and considered PECO's "initial" brief filed in violation of the briefing order, which stated that "[t]he Initial Brief of the Complainant shall be filed and served no later than June 9, 1994" and that "[t]he Responding Brief of the Respondent shall be filed and served no later than June 29, 1994." [6]

We conclude that ALJ did not abuse her discretion in accepting and considering PECO's initial brief. Before ALJ's initial decision, the Township did not move to strike PECO's initial brief nor file a reply brief to respond to PECO's brief. Moreover, PUC regulations permit PUC or ALJ to disregard any procedural error or defect at any stage of a proceeding. 52 Pa.Code § 1.2(b). Since PUC's decision is amply supported by the evidence in the record, ALJ's acceptance and consideration of PECO's initial brief did not affect the Township's substantive rights asserted in the complaint.

Accordingly, the order of PUC is affirmed.

### ORDER

AND NOW, this 17th day of May, 1996, the order of the Pennsylvania Public Utility Commission in the above-captioned matter is affirmed.

---

4. The PECO's Tariff 11.1 and 11.2 only implement PUC's interpretation of Section 1303 that the "actual" notice of the public utility is required. Therefore, we reject the Township's argument that they are in direct conflict with Section 1303.

5. Even assuming that the issue was properly preserved for our review, the undisputed activities in the record subsequent to the Township's

request for the rate change amply support the conclusion that PECO did not unreasonably delay in processing the Township's request.

6. PUC regulation at 52 Pa.Code § 5.502(b) provides in pertinent part that "by direction of the presiding officer, the first or initial brief shall be filed by the participants upon whom rests the burden of proof and the other participants may then respond."