**WHEELING & LAKE ERIE RAILWAY COMPANY,
Petitioner,**

v.

**PENNSYLVANIA PUBLIC UTILITY COMMISSION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Feb. 6, 2001.
Decided June 11, 2001.

Richard R. Wilson, Altoona, for petitioner.

Lawrence F. Barth, Harrisburg, for respondent.

Jason D. Sharp, Harrisburg, for intervenor, Dept. of Transportation.

Before LEADBETTER, J., and FLAHERTY Senior Judge, and MIRARCHI, Senior Judge.

MIRARCHI, *Senior Judge.*

Wheeling & Lake Erie Railway Company (Wheeling Railway) appeals from an order of the Pennsylvania Public Utility Commission (PUC) directing Wheeling Railway to, *inter alia,* remove the existing

rail-highway crossing bridge and construct a new bridge at its sole costs, as recommended by the administrative law judge (ALJ).

The issues on appeal are: (1) whether the PUC's authority to regulate rail-highway crossings and allocate costs of constructing and maintaining such crossings pursuant to Sections 2702 and 2704 of the Public Utility Code (Code), *as amended,* 66 Pa.C.S. §§ 2702 and 2704, has been preempted by Section 10501(b) of the Interstate Commerce Commission Termination Act of 1995 (ICC Termination Act), 49 U.S.C. § 10501(b); (2) whether the PUC's decision is supported by substantial evidence and constitutes a reasoned decision; and (3) whether the PUC's order allocating to Wheeling Railway the entire costs of reconstructing the subject rail-highway crossing bridge constitutes an unconstitutional taking of its property without just compensation. We affirm.

I.

On March 28, 1995, the PUC instituted a proceeding to investigate the condition of the subject rail-highway crossing bridge pursuant to its authority granted by the Code. Based on the evidence presented at hearings held on October 26, 1995, March 18, 1997 and October 14, 1998, the ALJ made the following factual findings.[1]

The subject bridge is located in Fallowfield Township (Township), Washington County and carries Fox Stop Road, a township road, over Wheeling Railway's railroad tracks. The bridge was constructed in 1930 by Pittsburgh & West Virginia Railway Company (Pittsburgh Railway) pursuant to the order of the Public Service Commission, the predecessor of the PUC, granting Pittsburgh Railway's petition for approval of the construction. The construction of the bridge was necessary due to the excavation of the hill by Pittsburgh Railway to expand its rail line through the area. In approving the construction of the bridge, the Public Service Commission directed Pittsburgh Railway to, *inter alia,* pay "all costs and expenses incident to the construction and maintenance of the new bridge and the guard rail fences." Public Service Commission's August 1, 1929 Order.

In July 1962, Pittsburgh Railway leased its rail line and related facilities to Norfolk & Western Railway Company (Norfolk Railway). Subsequently in May 1990, Norfolk Railway in turn subleased its interests to Wheeling Railway, which currently operates one train a week in the area at speeds of twenty to thirty miles an hour over a single railroad track. Under the terms of the lease and the sublease, Wheeling Railway assumed the obligation of Pittsburgh Railway to maintain the subject bridge at its sole costs.[2]

1. Wheeling Railway did not present any evidence at the first and second hearings and filed a motion seeking to discontinue the proceeding or postpone further hearings pending its action filed in the federal district court to challenge, as a discriminatory tax, the PUC's decision allocating to Wheeling Railway the costs of constructing and maintaining the rail-highway crossing bridge at the other location. The ALJ denied the motion and issued an initial recommended decision. The PUC thereafter remanded the matter to the ALJ for a further hearing. At the third hearing held on remand, Wheeling Railway presented evidence to support its position. Subsequently

in *Wheeling & Lake Erie Ry. Co. v. Public Utility Commission,* 141 F.3d 88 (3rd Cir. 1998), *cert. denied,* 528 U.S. 928, 120 S.Ct. 323, 324, 145 L.Ed.2d 252 (1999), the United States Court of Appeals for the Third Circuit reversed the decision of the federal district court and held that the PUC's assessment of the construction and maintenance costs does not constitute a discriminatory tax under the Railroad Revitalization and Regulatory Reform Act of 1976, 49 U.S.C. § 11501.

2. To avoid the necessity of joining Pittsburgh Railway and Norfolk Railway in this proceeding, Wheeling Railway stipulated that under

The subject rail-highway crossing bridge, as constructed in 1930, is a 149 foot long, three-span steel structure through girder sitting on masonry abutments with a steel-reinforced concrete deck and an asphalt-wearing surface, and was designed to carry up to fifteen tons. The primary users of the bridge are the residents of ten to eleven homes and one business on the south side of the bridge, small school buses and small emergency vehicles. Wheeling Railway's witness conceded at the hearing that neither Wheeling Railway nor its predecessors had performed any maintenance work on the subject bridge since its construction. In the past, the Township patched potholes on the cartway of the bridge and removed vegetation, debris and snow from the cartway. In addition, the Township may have resurfaced the cartway.

After its inspection of the bridge in November 1996, the engineering firm hired by the Department of Transportation concluded that the load limit of the bridge should be reduced to six tons. The further inspections of the bridge in 1994, October 1996 and August 1998 by the engineering firms hired by the Township revealed that the bridge was in the seriously deteriorated condition. The surface, deck and pedestals of the bridge were cracking and spalling. The girders, floor beams, stringers, lateral bracing and column showed heavy rusting and stains from efflorescence with some section losses. The abutment at the bridge seats was cracking and spalling, and its slopes were eroding. The engineering firms recommended reconstruction of the bridge, concluding that necessary repairs of the bridge would cost as much as the reconstruction and would not eliminate the need for further repairs in the near future. They estimated that it would cost $644,099.50 to reconstruct the bridge, and $555,400 to make the necessary repairs not including $200,000 for removing the lead-based paint from the bridge and repainting it.

In the further recommended decision, the ALJ ordered Wheeling Railway to, *inter alia,* (1) remove the subject bridge and construct a new three-span bridge designed to meet the present-day load limit and standards and (2) maintain the newly constructed bridge in a safe condition. The ALJ allocated the entire costs of removing and reconstructing the bridge and maintaining the newly constructed bridge to Wheeling Railway. The ALJ also ordered the Township to remove snow, ice and debris from the highway approaches and the surface of the new bridge. The PUC subsequently denied Wheeling Railway's exceptions and adopted the ALJ's further recommended decision. Wheeling Railway's appeal to this Court followed.[3]

## II.

Section 102 of the Code, *as amended,* 66 Pa.C.S. § 102, defines a "public utility" to include a corporation owning or operating equipment or facilities for "[t]ransporting passengers or property as a common carrier." Under this definition, Wheeling Railway is a public utility subject to the provisions of the Code. Section 2702(b) of the Code grants the PUC exclusive power to appropriate property for construction of "crossings" across facilities of public utilities at, above or below grade and regulate construction, alteration, relo-

the indemnification provisions of the lease and the sublease, Wheeling Railway is required "to undertake whatever crossing responsibilities the [PUC] may legally impose on

[Wheeling Railway]." Stipulation of Counsel dated January 6, 1999.

3. The Township and the Department of Transportation intervened in this appeal.

cation, suspension or abolition of such crossings "to effectuate the prevention of accidents and the promotion of the safety of the public."[4]

██ Under its authority granted by the Code, the PUC may order necessary improvements and maintenance of the crossings to ensure the safety of the travelling public. *Pennsylvania R. Co. v. Pennsylvania Public Utility Commission,* 154 Pa.Super. 86, 35 A.2d 588 (1944). The PUC also has the authority to allocate the costs of construction, improvement and maintenance of the rail-highway crossing bridges pursuant to Section 2704(a) of the Code, which provides in relevant part:

[T]he cost of construction, relocation, alteration, protection, or abolition of such crossing, and of facilities at or adjacent to such crossing which are used in any kind of public utility service, shall be borne and paid, as provided in this section, by the public utilities, municipal corporations, municipal authority or non-profit organization ..., or by the Commonwealth, in such proper proportions as the commission may, after due notice and hearing, determine, unless such proportions are mutually agreed upon and paid by the interested parties.

## III.

██ Wheeling Railway first contends that the PUC's authority under the Code to regulate the subject bridge and allocate the costs of its maintenance and reconstruction has been preempted by the ICC Termination Act.[5]

Prior to the enactment of the ICC Termination Act in 1995, the states had the jurisdiction to regulate railroad tracts and facilities within their borders under the then Interstate Commerce Act. *Illinois Commerce Commission v. Interstate Commerce Commission,* 879 F.2d 917 (D.C.Cir. 1989). In replacing the Interstate Commerce Commission with the Surface Transportation Board, the ICC Termination Act further provides:

**(b)** The jurisdiction of the [Surface Transportation] Board over—

(1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and

(2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State,

is exclusive. Except as otherwise provided in this part, the remedies provided

4. A "crossing" under the Code is an intersection of two or more public utilities. *Southeastern Pennsylvania Transportation Authority v. Pennsylvania Public Utility Commission,* 140 Pa.Cmwlth. 270, 592 A.2d 797 (1991). A "railroad-highway crossing" is an intersection of a highway with a railroad right-of-way, upon which railroad tracks lie, and can be at, above or below the grade of the railroad tracks. *Id.*

5. This Court's scope of review of the PUC's decision is limited to determining whether the PUC violated constitutional rights or committed an error of law, or whether its findings are supported by substantial evidence in the record. *Aronson v. Pennsylvania Public Utility Commission,* 740 A.2d 1208 (Pa.Cmwlth. 1999), *appeal denied,* 561 Pa. 700, 751 A.2d 193 (2000). Further, the party who has prevailed before the PUC is entitled to the benefits of every inference which can be logically drawn from the evidence viewed in a light most favorable to that party. *Shenango Township Board of Supervisors v. Pennsylvania Public Utility Commission,* 686 A.2d 910 (Pa.Cmwlth.1996), *appeal denied,* 548 Pa. 676, 698 A.2d 597 (1997).

under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.

49 U.S.C. § 10501(b)(1) and (2).

Wheeling Railway asserts that "rail transportation" under 49 U.S.C. § 10501(b) should include rail-highway crossing bridges constructed by a railroad company within its right-of-way, over which the Surface Transportation Board now has the exclusive jurisdiction, and that the PUC therefore no longer has the authority to regulate the rail-highway crossing bridges.[6]

■■■■ In determining whether the state law has been preempted by the federal statute under the Supremacy Clause of the United States Constitution, U.S. Const. art. VI, cl. 2, the court must ascertain the intent of the Congress in enacting the federal statute. *Fidelity Federal Savings & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982). The legislative intent to preempt the state law may be either explicit or implied. *Jones v. Rath Packing Co.*, 430 U.S. 519, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977). The preemption may be inferred (1) where the scheme of the federal regulation is so pervasive that the Congress left no room for the states to supplement it; (2) where the federal statute touches a field, in which the federal interest is so dominant that it must be assumed that the Congress intended to preclude enforcement of the state laws on the same subject; or (3) where the state law conflicts with the federal law, thereby rendering

compliance with both federal and state laws an impossibility. *Federal Savings & Loan.*

■■■■ It is well established that a federal statute may be interpreted as preempting the traditional state powers, only if such result is the clear and manifest purpose of the Congress. *Department of Revenue v. ACF Industries, Inc.*, 510 U.S. 332, 114 S.Ct. 843, 127 L.Ed.2d 165 (1994). As a general rule, preemption of the states' traditional police power by the federal statute is not favored. *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963).

It has been consistently held that the states have the traditional police power reserved by the Constitution to regulate the public safety of the rail-highway grade crossings and allocate the costs of constructing, maintaining and improving such crossings. *See, e.g., Atchison, T. & S.F. Ry. Co. v. Public Utilities Commission of California*, 346 U.S. 346, 74 S.Ct. 92, 98 L.Ed. 51 (1953); *Lehigh Valley R. Co. v. Board of Public Utility Commissioners*, 278 U.S. 24, 49 S.Ct. 69, 73 L.Ed. 161 (1928); *Erie R. Co. v. Board of Public Utility Commissioners*, 254 U.S. 394, 41 S.Ct. 169, 65 L.Ed. 322 (1921); *Chicago, B. & Q.R. Co. v. State of Nebraska*, 170 U.S. 57, 18 S.Ct. 513, 42 L.Ed. 948 (1898); *Chicago, B. & Q.R. Co. v. City of Chicago*, 166 U.S. 226, 17 S.Ct. 581, 41 L.Ed. 979 (1897); *Southern Ry. Co. v. City of Morristown*, 448 F.2d 288 (6th Cir.1971), *cert. denied*, 405 U.S. 922, 92 S.Ct. 958, 30 L.Ed.2d 792 (1972); *American Trucking Ass'n v. Unit-*

---

**6.** The ICC Termination Act defines the term "railroad" to include "a bridge, car float, lighter, ferry, and intermodal equipment used by or in connection with a railroad," and "the road used by a rail carrier and owned by it or operated under an agreement." 49 U.S.C. § 10102(6)(A) and (B). The term "transportation" is defined as, *inter alia*, "a locomotive,

car, vehicle, vessel, warehouse, wharf, pier, dock, yard, property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property or both, by rail, regardless of ownership or an agreement concerning use." 49 U.S.C. § 10102(9). The Act, however, does not define "rail transportation."

*ed States,* 242 F.Supp. 597 (D.D.C.1965), *aff'd,* 382 U.S. 373, 86 S.Ct. 543, 15 L.Ed.2d 422 (1966); *CSX Transportation, Inc. v. Pennsylvania Public Utility Commission,* 125 Pa.Cmwlth. 528, 558 A.2d 902 (1989), *appeal denied,* 523 Pa. 651, 567 A.2d 654 (1989).

Our review of the language in Section 10501(b) of the ICC Termination Act demonstrates that the Act expressly grants the Surface Transportation Board the exclusive jurisdiction to regulate rail transportation with respect to "rates, classifications, rules ..., practices, routes, services, and facilities," and "the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities," even where the railroad tracks are located entirely within the state. Section 10501(b), however, does not expressly preempt the states' traditional police power over the public safety of the "rail-highway crossings."

Further, the legislative history of the ICC Termination Act also indicates that the Congress did not intend to preempt the states' traditional authority to regulate the rail-highway crossings within their borders:

> Conforming changes are made to reflect the direct and complete pre-emption of *State economic regulation of railroads. The changes include extending exclusive Federal jurisdiction to matters relating to spur, industrial, team, switching or sidetracks formerly reserved for State jurisdiction under former section 10907.* The former disclaimer regarding residual State police powers is eliminated as unnecessary, in view of the Federal policy of occupying the entire field of *economic regulation of the interstate rail*

*transportation system.* Although *States retain the police powers reserved by the Constitution,* the Federal scheme of *economic regulation and deregulation* is intended to address and encompass all such regulation and to be completely exclusive.

H.R.Rep. No. 104–311, 104th Cong. 1st. Sess. 95–96 (1995) (emphasis added).

Thus, it is clear that in Section 10501(b) of the ICC Termination Act, the Congress intended to preempt only the states' previous authority to economically regulate the rail transportation within their borders with respect to such matters as the operation, rates, rules, routes, services, tracks, facilities and equipment, and reserve the states' police power to regulate the safety of the rail-highway crossing.

Moreover, there is no conflict between the exclusive jurisdiction of the Surface Transportation Board to economically regulate the rail carriers under the ICC Termination Act and the states' authority to regulate the public safety of the rail-highway crossing, which is also part of the public highway. *See CSX Transportation, Inc. v. City of Plymouth,* 92 F.Supp.2d 643 (E.D.Mich.2000) (a state has the authority to regulate the railroads on the local, as opposed to national, safety issues, so long as the regulation is not in conflict with the federal statute and does not unduly burden the interstate commerce).[7]

Hence, we conclude that the PUC's authority under the Code to regulate the safety of the subject bridge and allocate the costs of its reconstruction has not been preempted, either explicitly or implicitly, by the ICC Termination Act.

---

**7.** On appeal, Wheeling Railway "acknowledges that the public interest in crossing safety may require some degree of state regulation or oversight." Wheeling Railway's Brief, p. 41.

## IV.

 Wheeling Railway next contends that the PUC's decision to allocate the entire reconstruction costs to Wheeling Railway is not supported by substantial evidence.

 In allocating the costs of construction, relocation, alteration, protection or abolition of the rail-highway crossings pursuant to Section 2704(a) of the Code, the PUC is not confined to any fixed rule or formula and must take all relevant factors into consideration. *AT & T v. Pennsylvania Public Utility Commission,* 558 Pa. 290, 737 A.2d 201 (1999). The relevant factors to be considered in allocating the costs include, but not limited to: (1) the party who originally built, owned and maintained the crossing; (2) the relative benefits initially conferred by the construction of the crossing; (3) the party who is responsible for the deterioration of the crossing; and (4) the benefits accrued from the reconstruction of the crossing. *Greene Township Board of Supervisors v. Pennsylvania Public Utility Commission,* 668 A.2d 615 (Pa.Cmwlth.1995). As long as the PUC's allocation of the costs is just and reasonable and has a sound legal and factual basis, it must be affirmed. *Millcreek Township v. Pennsylvania Public Utility Commission,* 753 A.2d 324 (Pa. Cmwlth.2000), *appeal denied,* 564 Pa. 739, 766 A.2d 1252 (2001).

The facts found by the PUC establish that Wheeling Railway's predecessor in interest, Pittsburgh Railway, received initial benefits from its construction of the subject bridge in 1930. The construction of the bridge was necessary because Pittsburgh Railway cut the hillside to extend its rail line through the area. Under the order of the Public Service Commission, Pittsburgh Railway also had the ongoing obligation to maintain the bridge in a safe condition at its sole costs, and Wheeling Railway in 1990 assumed that obligation. Wheeling Railway concedes that Wheeling Railway and its predecessors neglected that obligation and failed to perform any maintenance work on the bridge causing the severe deterioration of the bridge.

Wheeling Railway argues, however, that the Township should bear at least some of the reconstruction costs because the deterioration of the bridge was caused by the Township's alleged improper repairs of the surface of the bridge, and because the Township failed to notify Wheeling Railway of the need for the necessary maintenance earlier.

In so arguing, Wheeling Railway totally ignores the fact that Wheeling Railway and its predecessors, not the Township, had the obligation to properly maintain the bridge. Moreover, the record does not support Wheeling Railway's assertion that the Township's action caused the deterioration of the bridge. The Township's engineer testified on cross-examination that the improper sealing of "the joints" allowed water "to permeate down through the deck and onto the beam." N.T., p. 158. However, he never stated that the Township actually sealed the joints or otherwise improperly repaired the surface of the bridge.

Finally, Wheeling Railway will definitely benefit from the reconstruction of the unsafe bridge because it will eliminate the possibilities of its employees' injuries, damages to its facilities and disruption of its operation caused by the possible collapse of the bridge. The construction of a new bridge having a larger load capacity and meeting the current standards will also benefit the public by allowing large trucks, emergency vehicles and school buses to use the new bridge. However, we disagree with Wheeling Railway that the allocation of the reconstruction costs must

be based solely on the benefits accrued to the parties. As the United States Supreme Court stated:

> The railroad tracks are in the streets not as a matter of right but by permission from the State or its subdivisions. The presence of these tracks in the streets creates the burden of constructing grade separations in the interest of public safety and convenience. Having brought about the problem, the railroads are in no position to complain because their share in the cost of alleviating it is not based solely on the special benefits accruing to them from the improvements.
>
> . . . .
>
> When the appellant went on the street in question, they assumed the burden of sharing on a fair and reasonable basis the costs of any changes for the reason of public safety and convenience made necessary by the growth of the communities.

*Atchison*, 346 U.S. at 352–53, 355, 74 S.Ct. 92.

In this matter, the PUC considered all the relevant factors, including the initial benefits accrued to Wheeling Railway's predecessor by the construction of the bridge, Wheeling Railway's ongoing obligation to maintain the bridge at its sole costs, the failure of Wheeling Railway and its predecessors to fulfill that obligation causing the deterioration of the bridge, the comparison of the costs of the necessary repairs with the reconstruction costs, and the need for further repairs in the near future. We conclude, therefore, that the PUC's decision allocating the entire reconstruction costs to Wheeling Railway is amply supported by the evidence in the record.[8]

Wheeling Railway further contends that the PUC's decision is not a reasoned and articulate decision because the PUC ignored the evidence supporting its position and failed to discuss the issues in detail.

Section 703(e) of the Code, 66 Pa.C.S. § 703(e), requires the PUC to make findings "in sufficient detail to enable the court on appeal, to determine the controverted question presented by the proceeding, and whether proper weight was given to the evidence." The PUC's decision is sufficient under Section 703(e), if it refers to the facts in the record supporting its conclusion and sets forth the reasons for its decision. *Consolidated Rail Corp. v. Pennsylvania Public Utility Commission*, 155 Pa.Cmwlth. 537, 625 A.2d 741 (1993). Further, the PUC is not required to consider, expressly and at length, each and every contention raised by the party. *University of Pennsylvania v. Pennsylvania Public Utility Commission*, 86 Pa.Cmwlth. 410, 485 A.2d 1217 (1984).

In denying Wheeling Railway's exceptions, the PUC incorporated the ALJ's twenty-one page decision setting forth the evidence presented by the parties, the factual findings supporting the decision and extensive discussion of the issues raised by Wheeling Railway. Contrary to Wheeling Railway's contention, the mere fact that the record contains some evidence which

---

**8.** Wheeling Railway argues that the PUC failed to consider the financial impact of allocating the entire reconstruction costs to Wheeling Railway. At the hearing, however, Wheeling Railway did not present any evidence of the alleged financial impact. Moreover, an otherwise valid exercise of the police power is not rendered unconstitutional mere-ly because of its financial impact, even when it "result[s] in the entire suppression of business" or "forces the offending industry out of business." *Commonwealth v. Barnes & Tucker Co.*, 23 Pa.Cmwlth. 496, 353 A.2d 471, 479 (1976), *aff'd*, 472 Pa. 115, 371 A.2d 461 (1977), *appeal dismissed*, 434 U.S. 807, 98 S.Ct. 38, 54 L.Ed.2d 65 (1977).

795

may also support a different result is irrelevant in determining whether the PUC's decision complied with Section 703(e) of the Code. Since the PUC rendered the decision which is sufficient for our appellate review, we reject Wheeling Railway's contention.

V.

Finally, Wheeling Railway contends that the allocation of the entire costs of removing and reconstructing the subject bridge to Wheeling Railway constitutes an unconstitutional taking of its property without just compensation.

 Wheeling Railway, however, failed to raise that issue before the ALJ or the PUC and as a result, neither the ALJ nor the PUC addressed that issue in their decisions. It is well established that where, as here, the appellant failed to raise the issue before the agency, the issue has been waived and cannot be considered on appeal. *Springfield Township v. Pennsylvania Public Utility Commission,* 676 A.2d 304 (Pa.Cmwlth.1996). Suffice to note that it has been held that the assessment of the costs of constructing, maintaining and replacing the rail-highway crossing bridge on the rail carriers does not constitute an unconstitutional taking. *See Chicago, Burlington & Quincy R.R. Co. v. People of the State of Illinois,* 200 U.S. 561, 26 S.Ct. 341, 50 L.Ed. 596 (1906) (the imposition of the costs of removing and rebuilding a railway bridge and culvert on the rail carrier does not amount to a taking of private property for public use); *Cincinnati, Indianapolis & Western Ry. Co. v. Connersville,* 218 U.S. 336, 31 S.Ct. 93, 54 L.Ed. 1060 (1910) (after opening a highway, the state may require the rail carrier to construct a rail-highway crossing bridge at its sole costs, in exercising its police power). *See also Commonwealth v. Barnes & Tucker Co.,* 23 Pa.

Cmwlth. 496, 353 A.2d 471 (1976), *aff'd,* 472 Pa. 115, 371 A.2d 461 (1977), *appeal dismissed,* 434 U.S. 807, 98 S.Ct. 38, 54 L.Ed.2d 65 (1977) (an otherwise valid exercise of the police power does not amount to an unconstitutional taking of property for public use).

Accordingly, the order of the PUC is affirmed.

*ORDER*

AND NOW, this 11th day of June, 2001, the order of the Pennsylvania Public Utility Commission in the above-captioned matter is affirmed.