125 Pa. Commonwealth Ct. 528 (1989)
558 A.2d 902
CSX Transportation, Inc., Petitioner
v.
Pennsylvania Public Utility Commission, Respondent.
No. 1583 C.D. 1988.
Commonwealth Court of Pennsylvania.
Argued February 8, 1989.
May 2, 1989.
*529 Argued February 8, 1989, before President Judge CRUMLISH, JR., and Judges CRAIG, DOYLE, BARRY, COLINS, McGINLEY and SMITH.
*530 David P. Helwig, with him, Gary F. Sharlock, Sharlock, Repcheck & Mahler, and R. Lyle Key, Jr., for petitioner.
Linda C. Smith, Assistant Counsel, with her, John B. Wilson, Deputy Chief Counsel, and Daniel P. Delaney, Chief Counsel, for respondent.
Christel L. Ertel-Kahlbaugh, Assistant Counsel, with her, Stephen F.J. Martin, Assistant Counsel, and John L. Heaton, Chief Counsel, for intervenor, Pennsylvania Department of Transportation.
OPINION BY JUDGE COLINS, May 2, 1989:
CSX Transportation, Inc. (CSXT) petitions for review of an order of the Pennsylvania Public Utility Commission (Commission) which, inter alia, overruled CSXT's exceptions and imposed upon it the responsibility of maintaining Abutment "M" and the superstructure of Span "A" of a bridge commonly known as the Mahoning Avenue Viaduct. This bridge carries Mahoning Avenue, a state highway, over and above the Shenango River, the tracks of The Pittsburgh and Lake Erie Railroad Company and Consolidated Rail Corporation (Conrail), and the right-of-way owned by CSXT.
The Mahoning Avenue Viaduct became part of the state highway system in January, 1960. At that time, pursuant to a complaint filed by the City of New Castle, the Commission ordered that the concerned parties perform tasks to rehabilitate the bridge, which was in need of repair.[1] In its order of May 9, 1960, the Commission assigned maintenance responsibilities for the bridge to the various parties. The Baltimore & Ohio Railroad Company (B&O Railroad) was ordered to furnish all material *531 and to do all work necessary to maintain Abutment "M" and the superstructure of Span "A" of the bridge, at its sole cost and expense. CSXT is the successor-in-interest to the B&O Railroad, the Chesapeake & Ohio Railway Company and the Pittsburgh & Western Railroad Company (P&W).
The results of an inspection conducted on the bridge in 1983 revealed that it was once again in need of repair. The Commission issued an Emergency Order on September 8, 1983, requiring that the bridge be posted for a maximum load limit of ten tons. The Pennsylvania Department of Transportation (Department) submitted preliminary plans for the reconstruction of the bridge to the Commission on July 19, 1984. A field investigation was conducted which revealed the need for extensive repairs to bring the bridge up to the maximum legal load limit. On September 14, 1984, the Department petitioned to reopen the record in Docket No. C-16920 in order to facilitate rehabilitation of the bridge. The Commission granted the Department's petition, approved the construction plans and ordered the Department to complete the work at its initial expense.
On May 20, 1987, a hearing was held for the purpose of determining the allocation of construction costs and the assignment of future maintenance responsibilities between the parties. At this hearing, CSXT offered testimony which indicated that neither C&O nor any of its affiliated companies had tracks under the Mahoning Avenue Viaduct at the time of the hearing. Further testimony indicated that P&W had previously owned tracks under this bridge and that these tracks were operated by B&O Railroad. The railroad line formerly operated on these tracks was known as the New Castle Branch. CSXT presented exhibits which indicated that in its decision and order dated September 4, 1980, the Interstate Commerce Commission (ICC) found that public convenience *532 and necessity permitted the abandonment of the New Castle Branch by P&W and service thereon by B&O. The ICC thereafter authorized this abandonment by certificate and decision dated November 26, 1980. An engineer employed by CSXT testified that physical removal of the tracks upon which the New Castle Branch had operated was completed in September of 1983.
Administrative Law Judge (ALJ) ROBERT P. MEEHAN filed his Recommended Decision on February 16, 1988, therein imposing upon CSXT the responsibility of maintaining Abutment "M" and the superstructure of Span "A" of the bridge. CSXT filed timely Exceptions to the ALJ's Recommended Decision.[2] CSXT also filed an application for a certificate of public convenience to abandon the crossing[3] with the Commission on March 30, 1988.[4] The Commission adopted the ALJ's recommendation regarding CSXT's future maintenance responsibilities and overruled CSXT's exceptions in its opinion and order entered June 1, 1988. CSXT filed a timely petition for review of that order with this Court.
CSXT presents three issues on appeal: (1) whether the Commission lacks the authority under Section 2702 of the Public Utility Code (Code)[5] to allocate maintenance responsibility for the Mahoning Avenue Viaduct to CSXT; (2) whether the Commission's authority affecting the abandonment of the New Castle Branch, including that portion which formerly crossed beneath the bridge, has been preempted by Section 10903 of the Revised Interstate Commerce Act;[6] and (3) whether such allocation *533 was just and reasonable and supported by substantial evidence.
We shall first address the issue of preemption. In determining whether a federal statute preempts a state law we must examine the construction of the two statutes and determine whether they are in conflict with one another. Furthermore, "if Congress evidences an intent to occupy a given field, any state law falling within that particular field is preempted." Silkwood v. Kerr-McGee Corporation, 464 U.S. 238, 248 (1984). The intent to occupy a given field may be explicitly stated in the federal statute's language or may be implied from the statute's structure and purpose. Jones v. Rath Packing Co., 430 U.S. 519 (1977). It must be noted that as a general rule, preemption is not favored. Florida Lime and Avocado Growers, Inc. v. Paul, 373 U.S. 132 (1963). Keeping these principles in mind, we must examine the nature and purpose of both Section 10903 of the Revised Interstate Commerce Act, 49 U.S.C. §10903, and Section 2702 of the Code, 66 Pa. C. S. §2702. We must then determine whether the Code interferes with the purpose underlying the federal statute and whether there can be no other conclusion drawn but that one preempts the other.
The Commerce Clause of the United States Constitution, U.S. Const. Art. I, §8, cl. 3, affords to Congress the power to regulate interstate commerce. In enacting the Revised Interstate Commerce Act, Congress has empowered the ICC to authorize the abandonment of railroad lines and rail transportation. Section 10903 of the Revised Interstate Commerce Act, 49 U.S.C. §10903, states:
§10903. Authorizing abandonment and discontinuance of railroad lines and rail transportation (a) A rail carrier providing transportation subject to the jurisdiction of the Interstate Commerce *534 Commission under subchapter I of chapter 105 of this title may 
(1) abandon any part of its railroad lines; or
(2) discontinue the operation of all rail transportation over any part of its railroad lines; only if the [ICC] finds that the present or future public convenience and necessity require or permit the abandonment or discontinuance. In making the finding, the [ICC] shall consider whether the abandonment or discontinuance will have a serious, adverse impact on rural and community development.
(b)(1) Subject to sections 10904-10906 of this title, if the [ICC] 
(A) finds public convenience and necessity, it shall 
(i) approve the application as filed; or
(ii) approve the application with modifications and require compliance with conditions that the [ICC] finds are required by public convenience and necessity; or
(B) fails to find public convenience and necessity, it shall deny the application.
(2) On approval, the [ICC] shall issue to the rail carrier a certificate describing the abandonment or discontinuance approved by the [ICC].
. . .
Pursuant to Section 2702 of the Code the Commission maintains the exclusive jurisdiction to regulate the construction, alteration, maintenance and abolition of rail/highway crossings in the Commonwealth of Pennsylvania. Section 2702 of the Code, 66 Pa. C. S. §2702, provides in pertinent part:
(a) General rule.  No public utility, engaged in the transportation of passengers or property, *535 shall, without prior order of the commission, construct its facilities across the facilities of any other such public utility or across any highway at grade or above or below grade, or at the same or different levels; and no highway, without like order, shall be so constructed across the facilities of any such public utility, and, without like order, no such crossing heretofore or hereafter constructed shall be altered, relocated, suspended or abolished.
(b) Acquisition of property and regulation of crossing.  The commission is hereby vested with exclusive power . . . to determine and prescribe, by regulation or order, the points at which, and the manner in which, such crossing may be constructed, altered, relocated, suspended or abolished, and the manner and conditions in or under which such crossings shall be maintained, operated, and protected to effectuate the prevention of accidents and the promotion of the safety of the public.
66 Pa. C. S. §2702.
CSXT argues that the ICC's approval of the abandonment of CSXT's predecessor's rail line preempted the Commission's authority to require CSXT to file with the Commission an application for a certificate of public convenience to abolish this crossing which was at one time traversed by the abandoned rail line. This argument confuses the concept of rail line abandonment which is within the exclusive jurisdiction of the ICC and the abolition of a rail/highway crossing which is within the exclusive province of the Commission. These two concepts, contrary to what CSXT would have us believe, are not one and the same thing.
*536 Section 10903 of the Revised Interstate Commerce Act is clearly not in conflict with Section 2702 of the Code. This becomes clear when one examines the considerations taken into account by the ICC when determining whether to authorize abandonment of service and lines by a railroad company. Section 10903 mandates that the ICC consider whether the abandonment or discontinuance will have a serious, adverse impact upon rural and community development. The ICC's role in abandonment proceedings is to balance the immediate and local interest of the community and shippers against broader public interest in freeing interstate commerce from undue burdens. Mississippi Public Service Commission v. ICC, 650 F.2d 551 (1981). In contrast, the Commission's tantamount concern in issuing certificates of public convenience for the abandonment of rail/highway crossings is the condition of the rail/highway crossing and the safety of the public.
The Commission concedes in the discussion portion of its opinion and order that the abolition of rail lines is a matter within the exclusive jurisdiction of the ICC. However, the Commission emphasizes that the removal of any tracks at a rail/highway crossing within the Commonwealth of Pennsylvania lies exclusively within the jurisdiction of the Commission. We agree with the Commission that the abandonment of rail lines and the operation over such rail lines is distinct from the abandonment of a rail/highway crossing. Section 10903 does not expressly address the abandonment of rail/highway crossings and the statute's purpose and structure does not reflect Congress' intent to preempt state law with respect to the abolition of rail/highway crossings. We can ascertain no conflict between the statutes here involved.
In support of its preemption argument, CSXT cites Chicago & North Western Transportation Co. v. Kalo Brick & Tile Co., 450 U.S. 311 (1981). However, this case *537 is inapposite. In Kalo, the United States Supreme Court held that the ICC has exclusive jurisdiction over abandonment of rail lines and service and that the Interstate Commerce Act precluded a shipper from pressing a state-court action for damages against a regulated rail carrier when the ICC, in approving the carrier's application for abandonment, reached the merits of the matters the shippers sought to raise in the state court.
The facts of the instant matter are clearly distinguishable from those in Kalo. Here, there has been no challenge to the merits of the ICC's approval of the abandonment of the rail line and service thereon. The issues in the two cases are also distinguishable. In Kalo a shipper was challenging the reasonableness of the railroad's abandonment of the rail lines serving that shipper, which had already been considered by the ICC. In the present matter, the issue is whether the Commission retains jurisdiction over the abandonment of the rail/highway crossing despite the authorization of abandonment of the rail line and service on that line by the ICC.
Instructive but not authoritative is a decision of the ICC which addresses the jurisdiction of a state over the railroad right-of-way, including the crossings, after abandonment. In this decision, Chicago & North Western Transportation Co. Abandonment in Fond Du Lac and Dodge Counties, Wisconsin, (Docket No. AB-1, slip op. filed October 11, 1984), the ICC noted the objections of the State of Wisconsin to an allowance of abandonment as follows:
The Wisconsin Department of Transportation (WDT) is concerned about the restoration of the right-of-way after the abandonment, including the resurfacing of grade crossings, removal of rail bridges, removal of track materials and debris and the protection of wildlife during and after salvage *538 operations. It alleges that [Chicago & Northwestern Transportation Co.'s] evidence does not include costs required to properly salvage and restore the abandoned line. WDT requests that [the company] provide additional cost data and a detailed restoration plan and schedule.
Fond Du Lac, Opposition Section. In its discussion and conclusion section, the ICC stated:
WDT's concern about the clean-up and restoration of the right-of-way after abandonment is a matter within the jurisdiction of the state of Wisconsin.
Fond Du Lac, Discussion and Conclusion Section.
As pointed out by the Department, intervenor in this matter, "[t]o allow railroads to ignore the exclusive authority of the Commission to order and abolish a crossing in Pennsylvania would allow a railroad to receive rail line abandonment approval from the ICC and simply walk away from the deteriorating structure for which it had past maintenance responsibility." Such a result would divest the Commission of its ability to protect the public safety pursuant to the Code. For all of the foregoing reasons, we must conclude that the federal statute does not preempt the Code with respect to the abandonment of rail/highway crossings.
We shall now address CSXT's contention that the Commission lacks the authority under Section 2702 of the Code to allocate maintenance responsibility to CSXT for the Mahoning Avenue Viaduct. It is argued that because the formal ICC abandonment of the tracks and the physical removal of the tracks owned by CSXT's predecessor were effectuated prior to the Department's petition to reopen the record in this matter, the Commission had no authority over CSXT. This argument is meritless.
*539 CSXT cites Allegheny County Port Authority v. Pennsylvania Public Utility Commission, 427 Pa. 562, 237 A.2d 602 (1967), and Jennings v. Pennsylvania Public Utility Commission, 140 Pa. Superior Ct. 569, 14 A.2d 882 (1940), in support of its proposition. Neither case controls the disposition of this issue.
In Jennings the Superior Court held that because the Commission had previously entered an order authorizing rail/highway crossing abandonment by the Wilkes-Barre & Eastern Railroad Company, the commission was without jurisdiction to order that the railroad company make improvements to the crossing. The instant matter is distinguishable in that neither CSXT nor its predecessor-in-interest applied for and received the certificate of public convenience from the Commission necessary to abandon the crossing in question.
Allegheny is also distinguishable. In that case, the Pennsylvania Supreme Court held that the Allegheny County Port Authority (Authority) had no concern with a crossing known as the Black's Bridge crossing. This crossing was part of a street-railway transportation system operated by Pittsburgh Railways Co. (Railways) until the crossing was abandoned by Railways pursuant to the Commission's order of January 16, 1961. Thereafter, the Authority, pursuant to Section 3(b)(13) of what is commonly referred to as the Second Class County Port Authority Act,[7] condemned Railways' transportation system, thereby acquiring Railways' property "useful for the transportation of passengers for hire." Id. at 566, 237 A.2d at 604. The Supreme Court noted that the Commission had approved the application of Railways for abandonment of its street-railway services and facilities on its West End system of routes, which included the Black's *540 Bridge crossing. It was further noted that the Authority acquired by condemnation only that property owned by Railways which was useful for the transportation of passengers for hire. Accordingly, the Supreme Court concluded that the Authority did not and could not acquire Black's Bridge or Railways' abandoned railway facilities associated therewith. Based on its conclusion that the Authority did not have a rail facility situated at Black's Bridge crossing, it determined that the Authority had no concern with the crossing and therefore could not be required to bear any of the costs relating to the construction, relocation, protection or abolition of the crossing.
In Allegheny, as in Jennings, a proper application for a certificate of public convenience for the abandonment of the crossing in question was filed with and approved by the Commission. The facts of the instant matter indicate that no such application was made to the Commission prior to CSXT's removal of its tracks at the Mahoning Avenue Viaduct location. CSXT's argument that the removal of its tracks relieved it of its status as a concerned party with respect to this crossing is faulty. CSXT is not, as it argues, in a position equivalent to that of the Authority in Allegheny. The Authority had no concern with the Black's Bridge crossing because Railways had lawfully sought the authority to abandon that crossing with the Commission. Such authority was granted by the Commission. The Authority then could not condemn Railways' property which was abandoned and therefore not useful for the transportation of passengers for hire. Accordingly, the Authority had no concern with the property to which it had never acquired title.
CSXT remains a concerned party with respect to the rehabilitation of this bridge. It had no authority to physically remove its tracks beneath the Mahoning Avenue Viaduct without a Commission order authorizing abandonment of the crossing. It is further noted that CSXT *541 retains ownership of the right-of-way where its tracks previously lay. This also qualifies CSXT as a concerned party, subject to the jurisdiction of the Commission. CSXT, simply by virtue of the removal of its tracks without Commission authority, cannot circumvent the power of the Commission to dictate the manner in which rail/highway crossings may be abandoned. The promotion of public safety is fostered by requiring that those parties who wish to abandon a crossing comply with the established procedure for doing so. For all of the foregoing reasons, we hold that the Commission had the authority to allocate maintenance responsibilities to CSXT.
Our final task is to determine whether the allocation of maintenance responsibility to CSXT for Abutment "M" and the superstructure of Span "A" of the bridge was just and reasonable. In apportioning costs in rail/highway crossing cases, the Commission takes all relevant factors into consideration, with the fundamental requirement being that its order be just and reasonable. East Rockhill Township v. Pennsylvania Public Utility Commission, 115 Pa. Commonwealth Ct. 228, 540 A.2d 600 (1988).
In its decision, the Commission noted that the removal of the tracks by CSXT was in derogation of Section 2702 of the Code. It further noted:
That Span A of the Mahoning Avenue Viaduct crosses the right-of-way of B&O (CSXT's predecessor), consisting of a 227-foot long single span and a vertical clearance of 25.8 feet. . . . In our Order issued in 1960, we assigned maintenance responsibilities to B&O of `. . . Abutment "M" and the superstructure of Span "A" including the tress (sic) bearings of said span, but excluding the concrete roadway deck, curb, railing and sidewalk of the viaduct. . . .' Under the circumstances, we find *542 the assignment of maintenance responsibilities to CSXT, successor to B&O, warranted.
We must agree with the Commission that in light of the circumstances presented, the assignment of maintenance responsibilities to CSXT was warranted. As of the date of this writing, the Commission has not yet authorized CSXT's abandonment of the crossing in question. CSXT maintains a right-of-way at this location. In addition, because the Commission has not yet authorized the abandonment of this crossing by CSXT, its tracks would still remain at this location, but for its unlawful removal of said tracks in 1983. We conclude that the Commission's order assigning maintenance responsibilities to CSXT was just and reasonable under the circumstances. CSXT shall be responsible for the maintenance of Abutment "M" and the superstructure of Span "A" until such time as the Commission shall authorize CSXT's abandonment of this crossing.
The order of the Commission is affirmed.

ORDER
AND NOW, this 2nd day of May, 1989, the order of the Pennsylvania Public Utility Commission in the above-captioned matter is affirmed.
NOTES
[1] This complaint proceeding was initiated at Docket No. C-16920.
[2] Exceptions were also filed by Conrail and the Pittsburgh & Lake Erie Railroad Company.
[3] A crossing may be at-grade, above grade or below grade.
[4] That application was docketed at A-108076 and so far as we can ascertain, is still pending at the time of this writing.
[5] 66 Pa. C. S. §2702.
[6] 49 U.S.C. §10903.
[7] Act of April 6, 1956, P.L. (1955) 1414, as amended, 55 P.S. §553(b)(13).