### FRIENDS OF the ATGLEN-SUSQUEHANNA TRAIL, INC., Petitioner,

### v.

### PENNSYLVANIA PUBLIC UTILITY COMMISSION, Respondent.

Commonwealth Court of Pennsylvania.

Argued April 15, 1998.

Decided Aug. 18, 1998.

---

**5.** See footnote 3 for a brief discussion of the tolling of the statute of limitations applicable to Section 306.1.

Joyce A. Nettke, Strasburg, for petitioner.

Susan D. Colwell, Harrisburg, for respondent.

David C. Eaton, Harrisburg, for intervenor, Consol. Rail Corp.

Before COLINS, President Judge, and McGINLEY, SMITH, PELLEGRINI, FRIEDMAN, KELLEY and LEADBETTER, JJ.

SMITH, Judge.

Friends of the Atglen–Susquehanna Trail, Inc. (FAST) petitions for review of an order of the Pennsylvania Public Utility Commission (Commission) that with minor modifications adopted the decision of an Administrative Law Judge (ALJ) and approved two Stipulations of Settlement (Settlements) that the Consolidated Rail Corporation (Conrail) entered into with seven townships in Lancaster County and with the Pennsylvania De-

partment of Transportation (DOT). The Settlements relate to the abolition of rail-highway crossings along the former Enola Branch rail line and to the transfer of Conrail's property.

FAST questions whether the Commission was preempted from ordering the demolition of historic bridges by Interstate Commerce Commission (ICC) and Surface Transportation Board (STB) orders; whether the Commission complied with the History Code, 37 Pa.C.S. §§ 101–906; whether the Commission erred by not including this case in a moratorium on such cases that it adopted pursuant to the Governor's policy of bridge preservation; whether the Commission complied with the Rails to Trails Act, Act of December 18, 1990, P.L. 748, 32 P.S. §§ 5611–5622; and whether the Commission's conclusion that certain bridges are near the end of their life span is supported by substantial evidence. The Commission questions whether FAST has standing to appeal.

Conrail filed notice with the ICC in October 1989 of its intent to abandon the Enola Branch, which runs primarily through seven townships in Lancaster County. In an order of February 14, 1990, the ICC authorized termination of rail service subject to conditions including that Conrail not transfer the property and take no steps to alter the historic integrity of the bridges on the line until completion of the historic review process under Section 106 of the National Historic Preservation Act, 16 U.S.C. § 470f. The Pennsylvania Historical and Museum Commission (Historical Commission) commenced a review of the structures along the Enola Branch as part of the Section 106 process, but it failed to follow through when Conrail sent in required information. In a decision of April 19, 1993, the ICC authorized Conrail to abandon the line but made no mention of the condition concerning the Section 106 review process.

Conrail filed an application with the Commission on September 29, 1993 for approval of the abolition of 31 rail-highway crossings along the Enola Branch. FAST was permitted to intervene in May 1994. On March 7, 1995, the Commission issued an order abolishing 6 crossings and listing 24 others for hearing. A separate proceeding involving a single crossing was consolidated with the larger case. The matter was submitted to alternative dispute resolution proceedings, and, after extensive negotiations, the parties arrived at the Settlements. Conrail agreed in the Settlements to convey the entire rail line in segments to the townships through which it passed and to give each township a lump sum of money related to the condition of the crossings. The majority of the crossing structures were to be kept in place; however, some were scheduled to be removed for safety reasons.

FAST objected, and the ALJ held hearings in June 1997. The Historic Preservation Trust of Lancaster County (Lancaster Trust) joined FAST's brief in opposition. The Department of Conservation and Natural Resources (DCNR) approved of the Settlements. The ALJ issued an order adopting the Settlements, as modified slightly, on September 17, 1997. On September 23, 1997, the STB, successor to the ICC, issued an order reopening the proceeding before it, denying FAST's request to extend the historic preservation condition to the entire Enola Branch and reaffirming the historic preservation condition as slightly modified. Several parties filed exceptions to the ALJ's order, and the Commission entered its final order October 9, 1997, from which only FAST now appeals.[1]

I

The Court turns first to the Commission's request that the Court quash this petition for review based on its contention that FAST lacks standing to appeal. The Commission acknowledges that FAST is a citizen-based, not-for-profit organization formed for the purpose of acquiring the Enola Branch to preserve the natural and historical resources

---

1. *This Court's* review of a decision of the Commission is limited to determining whether the necessary findings are supported by substantial evidence and whether there was an error of law or a constitutional violation. *Yellow Cab Co. of Pittsburgh v. Pennsylvania Public Utility Commission,* 673 A.2d 1015 (Pa.Cmwlth.1996).

of this corridor and to provide a multiple-use greenway for non-motorized transportation and recreation for all residents of Lancaster County. The Commission notes, however, that under Section 702 of the Administrative Agency Law, 2 Pa.C.S. § 702, only a person who is aggrieved by an agency adjudication and has a direct interest therein may appeal.

The Commission cites the standard articulated by the Pennsylvania Supreme Court in *William Penn Parking Garage, Inc. v. City of Pittsburgh*, 464 Pa. 168, 346 A.2d 269 (1975). To have standing to appeal a party must have a direct interest in the subject matter; the interest must be immediate and pecuniary, not a remote consequence of the judgment, and the interest must be substantial and not simply the common interest of all citizens in procuring obedience to the law. The Commission asserts that FAST has no immediate or substantial interest, noting that FAST does not own the land or have a reasonable expectation of owning the land because of the agreements between Conrail and the townships. The Commission also stresses that permission for FAST to intervene did not confer standing to appeal. "Admission as an intervenor will not be construed as recognition by the Commission that the intervenor has a direct interest in the proceeding or might be aggrieved by an order of the Commission in the proceeding." 52 Pa.Code § 5.75(b).

■ On the merits of the standing issue, FAST notes that the requirement of a "substantial" interest means simply that it must have substance—there must be some discernible adverse effect to some interest other than the general interest in having others comply with the law. *William Penn Parking Garage, Inc.*, 464 Pa. at 195, 346 A.2d at 282. The requirement that an interest be "direct" means simply that the person claiming to be aggrieved must show causation of the harm by the matter of which he or she complains. *Id.* FAST refers to the evidence in the record of its efforts to purchase the Enola Branch for recreational and preservation purposes, including securing substantial

funding and negotiating with Conrail, and asserts that approval of the Settlements results in the loss of opportunity for FAST to carry out its mission. Further, FAST contends that, as a trails group, it is uniquely qualified to present issues relating to the Rails to Trails Act. Also, it claims standing based on Section 512 of the Historic Preservation Act, 37 Pa.C.S. § 512,[2] which provides in part that any "person or other legal entity may maintain an action in an administrative tribunal or court for the protection or preservation of any historic resource in this Commonwealth."

■ The Court agrees that FAST has standing to bring this appeal. First, there is no question that FAST possesses such standing as is conferred by Section 512 of the Historic Preservation Act because it is seeking to enforce both that Act and federal laws and policies relating to historic preservation. Second, as a trails group that has concededly exerted substantial efforts to acquire and convert the rail line at issue, FAST has an interest under the Rails to Trails Act that is direct, and it is well situated to advance the concerns of that Act.

## II

FAST contends first that the subject matter jurisdiction of the Commission was preempted by the orders of the ICC and the STB, where the Settlements provided for the demolition of certain bridges. The Commission's authority over abolition of crossings derives from the mandate of Section 2702 of the Public Utility Code, 66 Pa.C.S. § 2702. Subsection (b) vests the Commission with exclusive power "to determine and prescribe, by regulation or order, ... the manner in which [rail-highway] crossings may be constructed, altered, relocated, suspended or abolished ... to effectuate the prevention of accidents and the promotion of the safety of the public." The ALJ concluded on this question that the jurisdictions of the STB and the Commission are independent and exclusive of each other, noting that there is

2. Chapter 5 of the History Code, 37 Pa.C.S. §§ 501–512, is designated the Historic Preservation Act by Section 501.

no requirement that the STB formally approve abandonment of a rail line before the Commission is permitted to authorize abolishment of rail-highway crossings. The Commission agreed with this analysis.

FAST notes that the ICC was vested with broad power to regulate the abandonment of rail lines, which was later conferred on the STB. FAST quotes *Hayfield Northern R.R. Co., Inc. v. Chicago and North Western Transp. Co.*, 467 U.S. 622, 633, 104 S.Ct. 2610, 2617, 81 L.Ed.2d 527 (1984), where the Supreme Court stated: "[U]nless the [ICC] attaches postabandonment conditions to a certificate of abandonment, the [ICC's] authorization of an abandonment brings its regulatory mission to an end." Preemption of state law by federal law may take various forms, FAST notes, including what is known as "conflict preemption," where state law actually conflicts with federal law such that it is impossible for a private party to comply with both "or where state law 'stands as an obstacle to the accomplishment and execution of the full purpose and objectives of Congress.'" *English v. General Electric Co.*, 496 U.S. 72, 79, 110 S.Ct. 2270, 2275, 110 L.Ed.2d 65 (1990) (quoting *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941)). FAST asserts that conflict preemption applies here to divest the Commission of jurisdiction until the Section 106 review process is complete.

The Commission cites *CSX Transp., Inc. v. Pennsylvania Public Utility Commission,* 125 Pa.Cmwlth. 528, 558 A.2d 902, *appeal denied,* 523 Pa. 651, 567 A.2d 654 (1989), where a rail carrier asserted that the Commission was preempted from assigning maintenance responsibilities to it in regard to a crossing on a line for which the ICC had approved abandonment. This Court held that ICC authority over abandonment of rail lines, in the course of regulating com-

merce, did not preempt the Commission's authority to abolish crossings and to assign maintenance responsibilities, in the course of regulating the safety of crossings. The Commission notes further that the STB order requires conduct only on the part of Conrail and asserts that, should a conflict arise, Conrail could petition the Commission for an extension.

■ The Court concludes that the Commission was not preempted from proceeding in this matter and that its order is not in conflict with STB requirements. There is no question that in general the jurisdictions of the Commission over crossing abolition and the STB over rail line abandonment are different matters. *CSX Transp., Inc.* The Commission's conducting .its proceeding directed toward the ultimate and necessary disposition of the crossings within its unquestioned jurisdiction did not violate the STB's order or require Conrail to violate the order. Although approval of the Settlements will ultimately result in transfer of Conrail property and the eventual demolition of some bridges, the Commission took care to require that Conrail proceed with completion of the Section 106 review process in compliance with the STB order, and it thereby avoided any possible conflict between the state and federal regulatory agencies, with their different priorities and concerns.

III

Next FAST contends that the Commission did not comply with the requirements of the History Code, incorporating the arguments advanced in the brief of the Lancaster Trust, which assert that the Commission does not have a specific written plan regarding compliance with Section 508 of the Historic Preservation Act, *as amended,* 37 Pa.C.S. § 508.[3]

---

3. Section 508 provides in subsection (a) that Commonwealth agencies shall (1) consult the Historical Commission "before demolishing, altering or transferring any property under its ownership or control that is or may be of historical, architectural or archaeological significance"; (2) seek the advice of the Historical Commission "on possible alternatives to the demolition, alteration or transfer of property under their ownership or control that is or may be eligible for the Pennsylvania Register of Historic Places"; (3)

"[i]nitiate measures and procedures to provide for the maintenance by means of preservation, rehabilitation or restoration of historic resources under their ownership or control" that are or may be eligible for such listing; (4) "[i]nstitute procedures and policies to assure that their plans, programs, codes, regulations and activities contribute to the preservation and enhancement of all historic resources in this Commonwealth";

Although the Commission's procedures under 52 Pa.Code §§ 5.71–5.76 permit intervention by the Historical Commission, the Lancaster Trust argues that these procedures are passive in nature and not consistent with the action-oriented role required by the History Code. It states that the Historical Commission's opinion was not sought during the development of the Settlements, and in the absence of specific internal procedures and policies acknowledging Commission responsibility under the History Code, the Settlements are flawed.

The Lancaster Trust acknowledges *O'Connor v. Pennsylvania Public Utility Commission*, 136 Pa.Cmwlth. 119, 582 A.2d 427 (1990), which held that opinions of the Historical Commission are advisory and not binding upon other agencies, but it contends that the record shows that preservation of the historic resources involved here has not been considered adequately. It argues that the preservation-focused perspective is extended even further when historic properties are under the "ownership or control" of Commonwealth agencies or are likely to be affected by agency actions under Sections 508(1) – (3).

The Court agrees with the Commission that *Goldsborough v. Department of Education*, 133 Pa.Cmwlth. 487, 576 A.2d 1172 (1990), *aff'd*, 528 Pa. 588, 599 A.2d 645 (1991), applies to this question. There a school district sought statutorily required approval from the Department of Education (DOE) to partially demolish and reconstruct a school building eligible for inclusion on the Pennsylvania Register of Historic Places. This Court determined that DOE did not have "control" over the property within the meaning of the phrase property "under their ownership or control" in Sections 508(1), (2) and (3) of the Historic Preservation Act by virtue of its regulatory authority. Rather, that term meant physical ability to manage the day-to-day operation of the property and to make use of it for the agency's own needs. Therefore, DOE did not have to comply with Section 508, and the school district, as a political subdivision, was outside Section

and (5) submit the procedures to the Historical

508's express application only to Commonwealth agencies.

■ In the present case, although the Commission has jurisdiction to approve the abolition of rail-highway crossings, and its orders in that regard certainly have an effect on crossing structures, up to and including requiring other parties to demolish them where safety concerns in the public interest require, the Commission does not exercise the kind of control held to be required in *Goldsborough*. Also, State Historic Preservation Officer Brenda Barrett agreed with the ALJ when he asked whether he should consider her testimony as the opportunity for the Historical Commission to have input on Conrail's application.

## IV

FAST also asserts that the Commission erred by not including this case in a moratorium upon such cases that was issued by the Commission pursuant to the Governor's policy of bridge preservation. FAST notes that the Commission adopted the 18–month moratorium by order of October 23, 1997, that is, at its next public meeting after the order in this case. Further, the Commission denied FAST's request for reconsideration on November 6, 1997. FAST argues that this case, with 26 bridges, 6 bridges ordered to be demolished and all others at risk under the terms of the Settlements and with a Master Plan for trail use already prepared and with funding in place, is the perfect case for inclusion in the moratorium. In addition, FAST asserts that the timing of events creates an inference that *ex parte* communications resulted in the deliberate exclusion of this case from the moratorium. It bases this allegation on the ALJ's imposing an abbreviated briefing schedule, the short period allowed by the Commission for filing exceptions and the fact that the moratorium was adopted at the next public meeting on October 23, 1997, although not effective until December 10, 1997. 52 Pa.Code § 1.14.

The Commission responds that its decision not to apply the moratorium order to a case that had been completed is outside the sub-

Commission for review and comment.

ject matter of the October 9, 1997 order approving the Settlements. The Commission notes that it did not grant FAST's requests for reconsideration within the appeal period of the prior order. Should the merits of the denial of reconsideration be considered, the Commission refers to the reasons expressed in its order, i.e., that this case had been finally determined after extensive proceedings and that to apply the moratorium to a proceeding in which a final order had been entered would violate the due process rights of the other parties.

■ The Court agrees that this issue is not properly presented. FAST did not petition for review from the denial of its petition for reconsideration, in which the issue of the possible applicability of the newly adopted moratorium was raised. The Commission acknowledged in its order of October 9, 1997 that the Governor's policy was under development; however, at that time there was no Commission moratorium in existence that could be applied to this case. Even if the Court reviewed the merits of the denial of reconsideration, such review is limited to determining whether the Commission abused its discretion. *J.A.M. Cab Co. v. Pennsylvania Public Utility Commission,* 132 Pa. Cmwlth. 390, 572 A.2d 1317 (1990). Assuming, *arguendo,* that the record here implies an intent on the Commission's part to conclude this four-year-old case before adopting its moratorium, FAST's argument amounts to nothing more than a disagreement with such a policy decision. This Court could not conclude that the Commission's action constituted an abuse of discretion.

V

FAST argues also that the Commission failed to fulfill its mandate under the Rails to Trails Act. Section 10(b) of that Act, 32 P.S. § 5620(b), requires that the Commission, before taking action on any request for the abandonment or removal of a railroad grade crossing, bridge or tunnel, "shall consider the impact of such action upon the development, expansion and existing use of recreational trails pursuant to this act and identify and evaluate alternatives which will minimize any adverse impacts of commission actions upon

the development and use of recreational trails." FAST's trail designer witness, Charles A. Flink, offered into evidence the Atglen–Susquehanna Trail Master Plan, which he had prepared. Mark Wilson, sponsored by FAST, was the only engineer witness who examined 14 of the rail bridges crossing public roads and who provided cost estimates of repairs and modifications needed for trail use. The engineer witness for the Commission's Bureau of Transportation and Safety (BTS) conceded that the 2:1 slope that he recommended where structures over roads were to be removed is a very steep slope, not of the type preferred for trail use.

FAST contends that this issue goes directly to whether the ALJ considered mitigation under the Rails to Trails Act. Further, it argues that mitigation is left out of the picture by the provision of the Settlement with the townships that expressly includes removal of a structure in the definition of the responsibility to "maintain" it. The ALJ had the duty to determine whether the Settlements were in the public interest and to set aside provisions that were not, pursuant to the Commission's authority in Section 508 of the Public Utility Code, 66 Pa.C.S. § 508. That authority includes the power to reform and revise contracts of public utilities upon a fair, reasonable and equitable basis when the Commission determines after notice and hearing that terms of such obligations are adverse to the public interest and general well-being.

■ The Commission responds that its duty to consider the impact of its rail-highway crossing decisions upon recreational trails and to identify alternatives to minimize adverse impacts is not a requirement that it accommodate the desires of any particular entity advocating a particular proposal. The ALJ's order directed removal of only 10 of the 25 crossing structures at issue, determining that valid safety reasons existed for the removals. The Commission notes that DCNR, which is charged with the initial responsibility to evaluate the suitability of this and other railroad lines for trail development, was an active party in the proceedings and supports the Settlements. Further, the Commission's duties under the Rails to Trails Act cannot remove the original mandate to

the Commission to protect public safety under Section 2702(b) of the Public Utility Code.

■■■ This Court agrees that the record in this case shows that the Commission did comply with its obligations under the Rails to Trails Act to consider the impact of its action of approving the Settlements and to identify alternatives. The extensive participation of FAST in this case and the admission into evidence of its Master Plan, as well as the participation of DCNR pursuant to the Commission's procedures for providing notice to DCNR in such cases, show that the ALJ and the Commission considered alternatives to the proposed action. The Commission approved letting some bridges stand that might otherwise have been ordered to be removed for the benefit of any future trail use. The Rails to Trails Act does not require more.

## VI

■■■ Finally, FAST contends that the Commission's conclusion that some bridges are near the end of their life span to support the option for demolition was not supported by substantial evidence. FAST asserts that the ALJ misunderstood the testimony of its witness Wilson in concluding that the bridges had neared the end of their useful lives. The ALJ made over 350 factual findings, most of which concerned detailed descriptions of the condition of each of the bridges at issue here, based upon reports of the BTS, Conrail and the townships. The Commission adopted these findings. Substantial evidence is such evidence as a reasonable person might accept as sufficient to support a finding of fact. *O'Connor.* In the Court's view the record contains ample evidence to support the finding that the older bridges involved here, all of which were constructed shortly after the turn of the last century, may reasonably be viewed as nearing the end of their useful lives. Accordingly, the order of the Commission is affirmed.

### ORDER.

AND NOW, this 18th day of August, 1998, the order of the Pennsylvania Public Utility Commission is affirmed.

Dissenting opinion by COLINS, President Judge.

COLINS, President Judge, dissenting.

I dissent only so far as to the majority's conclusions contained in Section V of the scholarly and well-prepared opinion. I do not feel that the ALJ properly considered the "mitigating" issues under the Rails to Trails Act.

I would remand to the ALJ for additional findings of fact regarding mitigation and, thereafter, a reconsideration of the propriety of the settlements made with the various townships.